Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT

for the

## Middle District of Florida

## Orlando Division

|  |  |
|---|---|
| <br>Damon P Jones<br>_____<br>*Plaintiff(s)*<br>*(Write the full name of each plaintiff who is filing this complaint.*<br>*If the names of all the plaintiffs cannot fit in the space above,*<br>*please write "see attached" in the space and attach an additional*<br>*page with the full list of names.)*<br>**-v-**<br><br>Daytona State College<br>_____<br>*Defendant(s)*<br>*(Write the full name of each defendant who is being sued. If the*<br>*names of all the defendants cannot fit in the space above, please*<br>*write "see attached" in the space and attach an additional page*<br>*with the full list of names.)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. _____<br> *(to be filled in by the Clerk's Office)*<br><br>Jury Trial: *(check one)*  ☐ Yes  ☒ No |

## COMPLAINT FOR A CIVIL CASE

I.     **The Parties to This Complaint**

A.     **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Damon P Jones |
| Street Address | 565 S. Atlantic Ave |
| City and County | Ormond Beach |
| State and Zip Code | Florida; 32176 |
| Telephone Number | 386-451-6848 |
| E-mail Address | wayke2003@yahoo.com |

B.     **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1

Name                              **Daytona State College**

Job or Title *(if known)*

Street Address

City and County

State and Zip Code                ~~1200 w. International Blvd. 32114~~

Telephone Number                  386-506 - 3000

E-mail Address *(if known)*       djh@bushlawgroup.com

Defendant No. 2

Name

Job or Title *(if known)*

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address *(if known)*

Defendant No. 3

Name

Job or Title *(if known)*

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address *(if known)*

Defendant No. 4

Name

Job or Title *(if known)*

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address *(if known)*

## II.     Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction?  *(check all that apply)*

☒ Federal question                    ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.     If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

-Title VI &VII of the civil rights act of 1964

-42 U.S.C. ,1981

-Title 19, U.S.C. Section 242 Dep. of Rights

-Americans With Disabilities Act 1990

-29 U.S.C. 107

### B.     If the Basis for Jurisdiction Is Diversity of Citizenship

1.     The Plaintiff(s)

a.     If the plaintiff is an individual

The plaintiff,  *(name)* _____ , is a citizen of the State of *(name)* _____ .

b.     If the plaintiff is a corporation

The plaintiff,  *(name)* _____ , is incorporated under the laws of the State of *(name)* _____ , and has its principal place of business in the State of *(name)* _____ .

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.     The Defendant(s)

a.     If the defendant is an individual

The defendant,  *(name)* _____ , is a citizen of the State of *(name)* _____ . Or is a citizen of *(foreign nation)* _____ .

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

b.    If the defendant is a corporation

The defendant,  *(name)*  _Daytona State College_ , is incorporated under

the laws of the State of *(name)*  _Florida_ , and has its

principal place of business in the State of *(name)* _____ .

Or is incorporated under the laws of *(foreign nation)* _Florida_ ,

and has its principal place of business in *(name)* _Florida_ .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

## III.    Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

Daytona State College Employees,
with the full support of it's supervisors threatened, unlawfully
terminated , harassedand retaliated against a disabled veteran student. They attempted to deprive Mr. Jones of his educational benefits based on fraudulent claims, then when confronted with a discrimination
complaint , perjured themselves and falsely accused him of stalking in hopes toretaliate against him for
his complaint.

DSCs fraudulent claims resulted in Mr. Jones receiving an erroneous injunction by the local courts .

The local courts violated jurisdiction under 29 U.S.C. 107 therefore void ab inhito. many other  other federal state and local  laws were also violated by DSC.

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

7.5 million dollar suit ,
for emotional distress
as a consequence of
discriminatory
practices and irreplaceable harm caused by  Daytona State College

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:        27 April 2021

Signature of Plaintiff

Printed Name of Plaintiff        Damon P. Jones

### B.    For Attorneys

Date of signing:        _____

Signature of Attorney        _____

Printed Name of Attorney        _____

Bar Number        _____

Name of Law Firm        _____

Street Address        _____

State and Zip Code        _____

Telephone Number        _____

E-mail Address        _____



Damon Philip Jones
E-mail: wayk8a003@yahoo.com
565 S. Atlantic Avenue
Ormond Beach, Florida 32176
Telephone: 386.451.6848

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF FLORIDA

3
4      [PROPOSED] COMPLAINT IN
5      INTERVENTION FOR VIOLATIONS OF:
6
7      (1)    TITLE VII OF THE CIVIL RIGHTS ACT OF
8      1964;
9      (2)    42 U.S.C. § 1981;
10     (3)    Title 18, U.S.C. Section 242
11     (4)    29 U. S. C. 107
12     (5)    (Evidence to be submitted post
13     haste)
14
15
16
17

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

        Plaintiff .

Damon P Jones                           18

        Plaintiff

        v.

Daytona State College

        Defendants.

[PROPOSED] COMPLAINT IN INTERVENTION

19
20
21
22
23
24
25
26
27
28
29
30
31

## **INTRODUCTION**

1.     Pursuant to 760.11(4)and(8) Florida statues and EEOC laws ; the Florida Commission on Human Relations and the EEOC has given Damon Philip Jones (" plaintiff ") authority " the right to sue" ; in lieu of his discrimination complaints against Daytona State College (" Daytona State " or " DSC " ) , for the actions of their employees ( collectively, " Defendants " ), in **any court of competent jurisdiction**; for its persistent engagement in an obsessively predatory, racially motivated retaliation scheme in an effort to deprive him of his federally mandated veterans benefits and to illegally obstruct and retaliate against him for legitimately opposing discrimination in the workplace by means of perjury, libelous slander and physical / legal threats. The original accusations made by him , which included, fraud, harassment, sexual harassment and racial discrimination are corroborated by the facts, evidence and other students.

2.     Although the plaintiff has in his possession voluminous amounts of evidence proving his claims. some statements made by Mr. Jones in this document are eyewitness statements seen by him ; therefore he does not have direct evidence of them besides his testimony; given that Mr. Jones has requested a collateral DOJ / FBI public corruption investigation; he is willing to take and seeks ( PV ) Polygraph test; administered by these institutions to compare the veracity of claims made by either party.

3.     Mr. Jones ; a student / employee enrolled in the Bachelor's of Science and Engineering Technology program at Daytona State College (DSC) ; working at DSCs' Veterans Center under a **for cause federal contract** in the Veterans Administration ( VA) federally funded Work Study benefit Program; established under , **38 CFR § 21.4145 - Work-study allowance,** was threated by a " similarly- situated " employee, Joshua Marcum on March 10th 2019 and subsequently; unlawfully terminated and denied equal opportunity for future employment by the work study site supervisor Ms. Damaris Najera on the same day.

4.     As a consequence of Mr. Jones reporting the threat and what Mr. Jones believed to be an unlawful termination , to DSCs Equity Officer ( EO), Lonnie Thompson ; Mr. Jones was immediately retaliated against by Mr. Thompson who subjected him to a litany of physical / legal threats and interventions designed to dissuade and discourage him from filing his complaint and a coordinated campaign of harrassment by local public officials; possibly including local circuit and appellate court Judges ; who used their authority and offices "under the **color** of law ", to assist , wittingly or unwittingly, DSCs unlawful retaliation against him for his **peaceful** and **legal** engagement in the constitutionally "protected activity " of opposition of discrimination in the workplace.

5.     The illegal retaliation included DSC employee Ms. Damaris Najera who , as the evidence suggest , has exhibited a compulsion to accuse students who file complaints against her of stalking. True to her modus operandi, Ms. Najera fabricated accusations of Mr. Jones stalking her when she was informed by her supervisor Lonnie

74   Thompson about the complaints filed by the plaintiff regarding her unprofessionalism and
75   discriminatory practices. Having expert familiarity with EO laws Ms. Najera was fully
76   aware ; the plaintiff was not " stalking " her nor was "obsessed" and was simply engaging
77   in opposition to discriminatory acts within the predefined procedures established by
78   federal, state and local regulations and DSCs own well – established complaint procedures.
79   Ms. Najera's actions regarding her stalking allegations against the plaintiff were a planned
80   and coordinated act , an act that she has apparently engaged numerous times , which was
81   designed to obstruct Mr. Jones' complaint and to retaliate against him.

83   6.     Given that Mr. Jones' complaints concerning the veterans center existed
84   months **prior** to Ms. Najera's employment ( Exhibit A) at the school or Mr. Jones even
85   knowing who she was and the fact Ms. Najera's stalking allegations were for a **perceived**
86   and or fabricated stalking incident . an incident which allegedly occurred 3 months prior to
87   her **falsely** reporting stalking accusations to the police and courts and only **after** . Mr.
88   Jones reported Ms. Najera to the courts **first** for issuing what he felt and still feels were a
89   series of harassing emails in regards to the unlawful termination she participated in. It is
90   clear that no stalking occurred and the plaintiff was not "obsessed" as testified by her
91   supervisors in court , with her but was simply filing a simple discrimination complaint
92   through the proper channels for the defendants persistent unlawful behavior.

94   7.     Ms. Najera along with her supervisors sought retaliation with her
95   injunction; as evidenced by the suspicious timing of her injunction. It is without question
96   that Ms. Najera issued the injunction as a retaliation and a distraction designed to evade
97   accountability; as she feared, when Mr. Jones sought relief outside the direct control of her
98   complicit institution, could not shield her from the consequences of her unlawful activities.

100  8.     The fraudulent accusations made against the plaintiff were only backed
101  by false testimony from her supervisors Mr. Keith Kennedy and Mr. Lonnie Thompson
102  which resulted in Mr. Jones receiving a " stalking " charge on his school and in court
103  records. No video , or campus security reports of stalking were ever provided to the

104    courts even though the areas where the stalking allegedly occurred were canvassed by

105    security cameras. Mr. Jones had previously reported all of these individuals to various civil

106    rights organizations for their discriminatory practices months **prior** to Ms. Nejeras

107    unsubstantiated stalking allegations, which again proves these DSC employees were

108    motivated by retaliation .

110    9.    The aforementioned individuals made false reports to police ; perjured

111    themselves in court; used their credentials as mental health professionals and school

112    resources to convene a behavioral health team ( BHT ) in an effort to substantiate their

113    fraudulent claims of "obsessive" behavior ; accused Mr. Jones of being a " fraud " in court

114    for participating in the VA work-study program, fired , banned, intimidated , falsely

115    accused other students/ employees of " stalking , implied false claims about Mr. Jones'

116    disability status in court and on official EEOC documents and successively extended bans

117    on school property against Mr. Jones , whenever they discovered he was continuing to

118    pursue his **lawful** " protected activity "; in spite of their intimidations .

120    10.    Incidental to Mr. Jones' protected discrimination opposition activity: Mr.

121    Jones was informed by his coworker, Mr. Richard Nieves of a series of disturbing

122    comments made by Ms. Nejera; upon which his unlawful termination was predicated on ;

123    facts pertaining to his ethnicity and his name. Mr. Jones was not aware were motivating

124    factors in his unlawful termination when he initiated his complaint with Mr. Thompson.

125    Mr. Kennedy and Ms. Najera but found out during the course of his complaint process .

127    11.    DSCs unlawful and corrupt practices have caused great emotional and

128    financial stress to Mr. Jones , denied him access to school resources and classes essential to

129    his educational success and caused him to receive adverse legal judgments on his

130    permanent record ; all of which were obtained by the demonstrably fraudulent testimony

131    and claims of DSCs employees.

## JURISDICTION AND VENUE

12. This court has jurisdiction because Mr. Jones' original complaints were initiated under federal ' cause of action ' anti - discrimination statutes, specifically **28 U.S. Code § 1343** . Furthermore DSC , being a publicly funded college receiving federal funding; it is subject to compliance with EEOC ,DOE and DOL regulations which are authorized as a consequence of titles **VI, VII 42 U.S.C. § 2000d et seq & The American Disabilities Act ( ADA)**. Since the defendants are being accused of violating these federal discrimination statutes by the plaintiff , the court has competent jurisdiction to review this case.

13. Furthermore, given that Mr. Jones believes and has evidence that DSC staff used the courts to illegally retaliate and the Courts were fully aware they were applying laws outside of its jurisdiction; depriving Mr. Jones of his rights under the color of law thereby assisting DSC in its unlawful behavior; the plaintiff is also seeking relief from their jurisdictionally voided decisions of the local courts .

14. This U.S. District Court has jurisdiction to review and enjoin the state courts decisions, since Mr. Jones's benefits were deprived by the defendants under a federal contract ; his constitutionally protected due process rights were repeatedly and egregiously violated during the trials by the court as a component of DSCs retaliation stemming from the original deprivation and the state courts violating numerous jurisdictional requirements appended to federal law, regarding injunctions arising from labor disputes.

15. Under **Article VI** of the U.S. Constitution , given the numerous civil rights due process and jurisdictional violations of the Florida State Courts against the plaintiff ; affords this court the to review and possibly **overrule** the activities and decisions of the 7th Circuit and 5th District Courts of Florida,

16. Since Ms. Najera's false and retaliatory stalking claims and the plaintiffs original discrimination complaints were **inextricably linked** , as DSC paid for her legal representation in the matter , school resources were used to falsely persecute Mr. Jones and high ranking school officials, who were also named in Mr. Jones' original complaint, acted as her witnesses, it is clear

---

166 the unjust injunction would not have occurred **but for** the plaintiffs **legitimate** involvement in
167 opposition to discrimination and the courts violation of Mr. Jones's´ rights in pursuit of relief under
168 federal anti discrimination laws.
169

170 17. Given that the courts involvement arose from Mr. Jones' original **labor dispute**;
171 which was duly and legally initiated by him , under a **federal statute cause of action** and given
172 that the aforementioned courts , **clearly** violated numerous due process protections of Mr. Jones,
173 which shall be reviewed later in this document ; and his enumerated constitutional rights while he
174 was engaged in " protected activity " . The courts undue interventions denied him not only a fair
175 trial , but through their abuses of authority became a party to the intimidation effort of the
176 Defendants ; wittingly or unwittingly, causing " irreparable injury" through legal intimidation.
177

178 18. These unconstitutional actions not only caused irreparable harm to Mr. Jones
179 directly, but to all Floridians seeking relief for credible accusations of discrimination under federal
180 laws; as their unlawful decision essentially allows ,through binding precedence, individuals and
181 institutions to falsely accuse individuals of stalking with no evidence except heresy testimony
182 and unsubstantiated perjuries, essentially authorizing an institution to retaliate against "protected"
183 individuals; through legal means , in direct opposition of federal, state and local labor laws .
184

185 19. This jurisdictional " power grab " attempted by these courts ; with respect to the
186 plaintiffs rights to legally and peacefully oppose discrimination in the workplace ; sought to
187 discard any and all **well established** judicial constraints, in a **tyrannical** attempt to deprive the
188 plaintiff of his rights based on the retaliatory and wholly unsubstantiated accusations made against
189 him made by habitually perjurous DSC employees ; by issuing an injunction in a **labor dispute** ;
190 whilst depriving Mr. Jones of the full evidentiary review required in such cases as per ;
191

192 **29 U.S. Code § 107.Issuance of injunctions in labor disputes; hearing; findings of**
193 **court; notice to affected persons; temporary restraining order; undertakings.**
194

195 "**No court** of the United States shall have jurisdiction to issue a **temporary** or **permanent**
196 injunction in any case involving or growing out of a labor dispute, as defined in this chapter, except
197 after hearing the testimony of witnesses in open court (with opportunity for cross-examination.."
198

_____

199     The courts violated the requirements of this **federal** statute by:

200

201     a.) Failing to establish the "**unlawful threat**" alleged to be made by Mr. Jones;

202 which is required to issue an injunction in a case of this nature under this statute; in either the

203 temporary and permanent injunction trial.

204

205     [".(a)That **unlawful acts** have been **threatened** and will be committed unless

206 restrained.."]

207

208     b.) Restricting Mr. Jones from **cross examining** his main accuser in the permanent

209 injunction hearing, and restricting witnesses.

210

211     ["**No court of the United States shall have jurisdiction** to issue a temporary or

212 permanent injunction in any case involving or growing out of a labor dispute, as defined in this

213 chapter, except after hearing the testimony of witnesses in open court (**with opportunity for**

214 **cross-examination)"**]

215

216     **[pg.52. Trial Transcripts: Jones: Actually , your honor may I question Ms. Nejera**

217 **.../ Henderson : No , you can tell me your side of the story... ] .**

218

219

220     c.) No denial of services was issued by local law enforcement stating that they would

221 not provide security for DSC , nor was any retainer provided to the court by DSC in the event

222 that the courts injunction was issued improperly

223

224     "...**No temporary restraining order or temporary injunction** shall be issued **except**

225 on condition that complainant shall first file an undertaking with adequate security in an

226 amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense,

227 or damage caused by the **improvident or erroneous issuance of such order or injunction,**

228 including all reasonable costs (together with a reasonable attorney's fee) and expense of

229 defense against the order or against the granting of any injunctive relief sought in the same

230 proceeding and subsequently denied by the court..."

231

d.) Issuing an injunction for a duration of **more than 5 days** in the temporary trial, prohibited under federal law ; which DSC employees in turn, offered its institution as cause for permanently banning him from main campus ; consequently forcing Mr. Jones to drop a class mid semester resulting in loss of investments in the form of time , monies and labor required to maintain an acceptable GPA as is required by his GI BILL contract.

["…Such a temporary restraining order shall be effective for **no longer than five days** and shall become **void** at the expiration of said **five days**…"]

Given that the initial temporary injunction was **voided** in 5 days from its issuance, the subsequent final hearing could not be held as it was scheduled nearly two weeks after the voided temporary injunction and there can be no final hearing prefaced on a **voided** injunction.

20.   The plaintiff believes the Appellate court intentionally upend the supremacy clause by failing to take judicial notice of relevant federal statutes and constitutional laws : in pursuit of their predetermined decision. as the judges were sufficiently informed by Mr. Jones in numerous briefs and motions . **legally binding** supreme court . federal and state precedence and all federal laws pertaining to **labor disputes** in the process. The plaintiff believes the 5th District. engaged in this behavior in an effort to allow the discretionary abuses of the 7th Circuit Judges: blatantly and intentionally failing to take judicial notice of basic tenants of jurisprudence, facts and evidence : a series of invasive decisions that can only be viewed as a self serving and injudicious enterprise at best . Due to the litany of civil rights violations imposed on Mr. Jones by the court: relief is sanctioned. authorized and **required** under the Deprivation of Rights family of statutes.

## TITLE 18, U.S.C., SECTION 242

Whoever, under **color of any law,** statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, … shall be fined under this title or imprisoned not more than one year…

263    21.    Allusions to **judicial immunity** in regards to injunctive relief sought by Mr. Jones
264    cannot be applied as the record shows that all Judges involved were at least **aware** that there were
265    jurisdictional errors present and they did not pay due deference to appropriate federal statues

267    **Rankin v. Howard, (1980) 633 F.2d 844, cert den. Zeller v. Rankin, 101 S.Ct. 2020, 451**
268    **U.S. 939, 68 L.Ed 2d 326.** "When a judge knows that he lacks jurisdiction, or acts in the face of
269    clearly valid statutes expressly depriving him of jurisdiction, **judicial immunity is lost.** "

271    Considering the aforementioned opinion is also confirmed by Florida's own attorney
272    general website ; and Mr. Jones ' case was reviewed by the 5th District under appeal , there can be
273    no question that his, on the record; objections to jurisdiction were given the scrutiny required and
274    his rights in regards to jurisdictional claims were simply **ignored.**

276    **https://www.myfloridalegal.com/ago.nsf/Opinions/BCE00EAC333422EE85256571005**
277    **EB5CC**

279    " Florida courts have not made a distinction between judicial and ministerial actions by
280    judges, therefore, in tort actions brought in Florida courts, judges currently enjoy absolute
281    immunity from damages liability for acts performed in the course of their judicial capacities **unless**
282    **such acts are undertaken with a clear absence or jurisdiction."**

284    22.    Considering the voluminous due process and jurisdictional violations visited upon
285    Mr. Jones by the courts ; the plaintiff believes and has evidence that ; the courts involved, issued
286    the injunction as a " political favor " of sorts due to the local influence of the supervisors of Ms.
287    Najera, which would make the decision , illegal, wholly unconstitutional and enjoinable by this
288    court.

290    23.    The evidence includes :

293    1) The allowance of possibly unauthorized FERPA protected and EEOC confidential
294    documents as evidence by the temporary injunction trial Judge ( Judge Warren), restricted by
295    law .

_____
[PROPOSED] COMPLAINT IN INTERVENTION

**The Florida Statues - TITLE VII EVIDENCE CHAPTER 90 EVIDENCE CODE 90.402**
Admissibility of relevant evidence.—All relevant evidence is admissible, except as provided
by law.

2) Judge Warren's denial of Mr. Jones' recusal request , where she decided to
continue her participation in the case being fully aware that " conflicts " existed ; choosing to
recuse shortly after making her erroneous temporary injunction decision .

**Florida Statutes**

38.10   Disqualification of judge for prejudice: application: affidavits: etc.—Whenever a party
to any action or proceeding makes and files an affidavit stating fear that he or she will not
receive a fair trial in the court where the suit is pending on account of the prejudice of the
judge of that court against the applicant or in favor of the adverse party. **the judge shall
proceed no further...**

3) Judge Warren's sua sponte  recusal after the plaintiff requested her recusal, where
she gave Judge Henderson " conflicts " as the reason for her recusal; without disclosing  the
nature  of these " conflicts " on the record ; an ethical expectation under the Florida Judicial
Bench Guide, possibly signifying untoward coordination between DSC officials and the Court
; suspicious behavior that caused Mr. Jones to seek recusal in the first place .

**Fla. Code Jud. Conduct**

**Canon 3E(1)** A judge **should disclose on the record** any information that he or she believes
the parties or their attorneys might consider relevant to disqualification, even if the judge
believes there is no real basis for disqualification.

4) Judge Warrens unlawful application of an injunction of more than 5 days in cases
arising from labor disputes.

5) Judge Henderson ( Judge Warren's replacement) , allowing Mr. Jones ' injunction
request and Ms. Najera's injunction request to be held as one trial ; when Mr. Jones requested
separate trials due to the complexities of the cases caused by DSCs persistent unlawful

328  interventions designed to obscure the initial set of facts pertaining to Mr. Jones' original
329  complaint.
330
331  6) Judge Henderson's continuation off the trial after he was aware of the suspicious
332  and irregular recusal activities of Judge Warren .
333
334  7) Judge Henderson's acknowledgement that the stalking case was a part of the civil
335  rights case out of his subject matter jurisdiction; yet continued to hear the case while ignoring
336  the relevant federal statutes involved in a labor dispute.
337
338       Pg. 14 Trial Transcripts:
339       [THE COURT:- But we're not here today for a -- a --
340       3 -- you know, civil rights lawsuit. That's not what -
341       4- -this courtroom does]
342
343
344  8) Judge Henderson citing and defining Mr. Jones' " repeated complaints" ; a
345  **legitimate** " protected activity " as stalking in his final decision , in **direct opposition** to
346  Florida's stalking statute itself in regards to its definition of " harrassment " and the failure to
347  define alleged the " unlawful threat " made by Mr. Jones , which is required to issue an
348  injunction, temporary or permanent, in a case stemming from a labor dispute.
349  Trial Transcripts Pg. 76
350  [THE COURT:- It's also uncontroverted that you
351       11- -have filed repeated complaints and repeated
352       12- -injunctions and also that you have contacted her prior
353       13- -employers.- And so based on all of that, I don't find
354       14- -that any of that serves any
355       legitimate purpose.]
356
357
358       **784.048  Stalking; definitions; penalties.—**
359       (1)  As used in this section, the term:

360                (a)  "Harass" means to engage in a course of conduct directed at a specific person

361    which causes substantial emotional distress to that person and **serves no legitimate purpose.**

362                (b).  "Course of conduct" means a pattern of conduct composed of a series of acts over

363    a period of time, however short, which evidences a continuity of purpose. **The term does not**

364    **include constitutionally protected activity** such as picketing or other organized protests.

366           Judge Henderson's highly erroneous ruling to determine that Mr.Jonses

367           constitutionally protected complaint was illegitimate was completely out of his

368           jurisdiction as he , as he admitted during the trial that he did not possess subject matter

369           jurisdiction in civil rights cases " **That's not what ·4· ·this courtroom does**".

370           Judge Henderson also claimed that the plaintiff contacted Ms. Nejeras prior employers,

371           an unsubstantiated claim made by her Counsel as no proof of this false claim was

372           provided by anyone.

374           The plaintiff believes that Ms. Najera believed Mr. Jones contacted her employers due

375           the accuracy of his recount of her actions at her prior place of employment regarding

376           her habitual pattern of falsely accusing students of stalking.

378           The fact is that Mr. Jones never contacted her employers about her activities at other

379           schools, but was only retelling what she told Mr. Nieves, thereby proving the accuracy

380           of his claims. Judge Henderson's decision clearly violated jurisdictional constraints .

382           24.    Furthermore, given that the Supreme Court has decided that Judges acting outside

383    of their jurisdiction are in effect **trespassers in law** , renders **all** decisions incidental to this case

384    **void ab inhito** . Mr. Jones shall not only be seeking a declaratory decree or judgement against the

385    courts but shall also be seeking a Writ of Mandamus against the 5th district and 7th circuit to

386    **immediately vacate** the wholly erroneous and harmful injunction imposed upon him in accordance

387    with the 60 (b) order he supplied to the court; an injunction which was prefaced on **fraud** by the

388    Defendants in question and the enjoinable jurisdictionally bereft Judges : clearly abusing their

389    discretion, authority and offices , against a Pro Se African American attorney **peacefully and**

390    **legally** exercising his right to oppose discrimination and violence in the workplace and at a

391    publicly funded learning institution.

**Elliot v. Piersol, I Pet. 328, 340, 26 U.S. 328, 340 (1828).**

U.S. Supreme Court stated that if a court is "without authority" , **its judgments and orders are regarded as nullities. They are not voidable, but simply void;** and form no bar to a recovery sought, even prior to a reversal in opposition to them. They constitute no justification; and **all persons concerned in executing such judgments or sentences, are considered, in law, as trespassers."**

## NATURE OF THIS ACTION

The following account contains graphically detailed yet wholly factual accounts of what the plaintiff has suffered during his employment at DSCs Veterans Center prior to Ms. Najera and her supervisors assuming their roles as veterans center supervisors and the considerably degenerating environment after they assumed authority. They are also necessary to establish that Mr. Jones' complaints preceded the arrival of Ms. Nejera and with good cause, and were not a consequence of any alleged " obsession" he had towards her . These recollections are not intended to embarrass , as embarrassing as they may be, but to demonstrate the toxicity and unprofessionalism of the workplace that DSC allowed.

The plaintiff, being formerly employed as a federal employee is a proponent of equality in the safety in the workplace and is trained in identifying discriminatory practices. He is also a proponent of equal rights and safety for women in the workplace and would never tolerate nor engage in any type of harrassment or stalking of a female employee and thoroughly believes that every claim of harrassment against a women should be thoroughly and fairly investigated.

Unfortunately, Mr. Jones believes Ms. Najera and her supervisors are the rare exception who utilize stalking claims to retaliate against individuals. Although Mr. Jones is in no way himself a mental health professional, from his research and citing her numerous complaints that numerous individuals are " stalking" her or "obsessed" with her ( 3 within the two years she's been employed at DSC ) , even individuals seeking to have her appropriately reprimanded for strident abuses of authority and unprofessionalism, he fears Ms. Najera may suffer from " false victimization" a well documented phenomenon wherein individuals believe that everyone is out to get them or are stalking them.

### Stalking: false claims of victimization: https://pubmed.ncbi.nlm.nih.gov/10211173/

[Conclusions: " The current interest in stalking is promoting false claims of being stalked. Early identification of these cases and appropriate intervention are essential to both minimizing abuses of resources available to true victims and equally to ensure appropriate care for those who express their own disordered state in false claims of victimization."]

Being a mental health professional Mr. Jones believes Mr. Thompson recognized Ms. Najera's proclivity to accuse others of stalking and " used " this character trait to manipulate her into making false claims against Mr. Jones , Mr. Nieves and anyone else he deemed a threat to his authority.

25. Mr. Jones being engaged in gainfully employment under a **legitimate** federal VA contract; which stipulated **for cause** termination; was denied equal opportunity to work under that contract **without cause** ; was denied equal opportunity to apply for work and was unlawfully terminated partially based on racial prejudice of his supervisor, Damaris Najera , unlawful and toxic workplace practices and coincidental similarities concerning his name and her ex husband's name Ms. Nejeras aversion to said name due to its perceived ethnic origins and possible emotional/ psychological issues of Ms. Najera , associating it with prior domestic abuse that she had admittedly suffered by her ex- husband, who has a similar name ; the plaintiffs name being no justification for employment or denial of employment as it is essentially an **ascribed** characteristic that he had absolutely no control over.

26. When the plaintiff was first informed of Ms. Najera's unreasonable aversion to Mr. Jones's "ethnic" sounding first name , he did not believe that he was denied employment

---

453
454
455
456
457
458
459
460
461
462
463
464
465
466
467
468
469
470
471
472
473
474
475
476
477
478
479
480
481
482
483
484

simply because his name was similar to her allegedly abusive ex husbands, until he was provided with proof from a source that shall remain anonymous at this time ( Exhibit B)

27.   Furthermore , in lieu of Mr. Jones' legitimate opposition to the aforementioned unlawful practices imposed on him by DSC; " protected activity " authorized under federal, state and local laws and regulations concerning discrimination complaints ; was illegally retaliated against by DSC through legal and physical threats intended to dissuade the plaintiff from seeking relief under title VI , VII and the ADA.

28.   Through perjury , fraud and abuses of authority; DSC in conjunction with local courts sought to deny Mr. Jones access to the federally mandated benefit VA work-study program; a benefit that he earned as a consequence of his honorable discharge as a 16 year veteran of the US Army and burdened him with a harmful injunction , in retaliation; for exercising his right to **peacefully** and **lawfully** oppose the discrimination associated with the initial denial of benefits.

29.   DSC's complaints regarding Mr. Jones's activities during in his legal and peaceful pursuits , are a trifling series of unsubstantiated falsehoods seeking to criminalize his participation in lawful opposition to discrimination as to allow them to escape accountability. DSC officials along with their attorney instigated a character assassination campaign against Mr. Jones.

30.   Mr. Kennedy and Mr. Thompson attempted to use their credentials as mental health professionals to falsely imply in court that Mr. Jones was suffering from PTSD , a diagnosis he does not have. These individuals also unethically claimed Mr. Jones' complaints were stemming from his alleged " obsession " with Ms. Nejera , eventhough Mr. Jones filed complaints pertaining to the workplace toxicity at DSC; **months prior** to even knowing Ms. Najera.

31.   Mr. Jones believes Mr. Kennedy and Mr. Thompson attempted to **manufacture evidence** in the form of a behavioral health report , to make Mr. Jones appear emotionally disturbed , in front of the Court for his legitimate participation in the " protected activity " of opposition to discrimination.

_____

[PROPOSED] COMPLAINT IN INTERVENTION

32. The court denied this report as evidence and there exist no prior behavioral health incidents involving Mr. Jones and was only initiated as a response in anticipation of the pending injunction case which stemmed from his original complaint. Mr. Jones sees this as a component of retaliation, a clear violation of their medical oaths and possibly witness tampering in a federal discrimination investigation.

33. Mr. Jones prior believes since they did not have sufficient evidence to prove their claims they manufactured this report, the motivating factor of her supervisors being, their pecuniary interest were involved in the success of Ms. Najera's retaliatory false stalking allegations being upheld. They too were named in Mr. Jones's original discrimination complaints. Mr. Jones believes they were so desperate to end Mr. Jones's complaints because if Ms. Najera was guilty, then they were also guilty by assisting her.

34. These individuals subjected the plaintiffs' EEOC **confidential** documents to an unethical and possibly illegal psychiatric content analysis ; that did not seek the **informed consent** of Mr. Jones ; possibly allowing **unauthorized** access staff and students in the sociology department access to the relevant confidential documents in question.

35. Mr. Jones believes that DSC allowed a toxic environment to exist at its workplace for the entirety of Mr. Jones' employment allowing drugs, fraternization and discriminatory practices enforced by a " group " of highly unprofessional work studys ; to dictate which veterans would be allowed to participate in their earned benefits VA program and aggravated the toxicity of the workplace by irresponsibly hiring an unprofessional supervisor who had preexisting psychological/emotional issues that prevented her from performing her duties fairly.

36. The plaintiff believes that DSC **vicariously discriminated** against Mr. Jones via the actions of their supervisor Damaris Najera and exposed him and other students to threats by rehiring Mr. Marcum; eventhough he had been terminated for belligerent and unprofessional conduct in violation of its zero tolerance harrassment/ threats policy.

[PROPOSED] COMPLAINT IN INTERVENTION

37. Mr. Jones believes DSC intentionally and immediately engaged in a slanderous and fraudulent retaliation effort to escape accountability for their support of the toxic workplace environment they had nurtured; which ultimately resulted in Mr. Jones being issued an unlawful injunction on his record which deprived him of critical school resources for 2 years under false pretenses , resources that he was entitled to as a paying law – abiding student of Daytona State College and causing him irreparable harm.

## **PARTIES**

38. Plaintiff Damon Philip Jones is a 45 year old African American male veteran, who intermittently worked as a **contracted** VA work-study employee for numerous years without incident ; supervised by for Defendant Daytona State College. Mr. Jones participated in the program until May 10th 2019, when he was terminated **without cause** , by the site supervisor Damaris Najera after being threatened by coworker Joshua Marcum.

39. Upon information and belief, Defendant Daytona State College is a publicly funded higher education learning institution with its principal place of business in Daytona Beach, Florida.

40. Plaintiff is informed and believes, and thereon alleges, that Defendant Daytona State College at all times relevant herein was engaged in providing accredited college courses to paying students.

41. At all times relevant herein, Daytona State College had at least fifteen employees. It is therefore an "employer" within the meaning of Title VII.

42. Plaintiff believes and has evidence of undue interventions by Judges of the 7th circuit and 5th district courts of Florida and is requesting injunctive relief under deprivation of rights under color of law statues.

43. Plaintiff is informed and believes, and thereon alleges, that at all times relevant herein each of the Defendants were responsible in some manner for the occurrences and injuries alleged in this complaint. Their names and capacities are included herein.

## **STATEMENT OF FACTS**

44. Mr. Jones ,was threatened on May 10th 2019 by Mr. Joshua Marcum. a fellow work study. Mr. Marcum who is a participant in a VA substance abuse program, by Mr. Marcum's own admission. Mr. Marcum smelled of alcohol according to the plaintiff. during the issuance of the threat . Ms. Najera, Daytona State Colleges Veterans Benefits Coordinator , subsequently fired Mr. Jones later that day for reasons that are not clear to the plaintiff at this time.

45. Mr. Marcum had been terminated during the prior semester , for being insubordinate and belligerent towards the centers prior supervisor : Alex Castillo. Mr. Marcum was fired again during the same semester he threatened Mr. Jones for an unrelated event: where he exhibited similar belligerent behavior towards a customer.

46. Mr. Jones understood at the time of his termination , that Mr. Marcum's employment was contingent upon his adherence to the rules of the substance abuse program, since he had been terminated before for his issues with alcoholism, which included abstention from alcohol. Mr. Jones believes his own termination was unlawful and was prefaced on racist views held by DSC employees namely Ms. Najera. Mr. Jones feels that Ms. Najera's supervisors Mr. Keith Kennedy and Lonnie Thompson discriminated against Mr. Jones **vicariously;** by supporting Ms. Najera's recommendations and false claims made about him by Ms. Najera. Mr. Jones was later retaliated against for filing a complaint against them.

47. School records indicate that Mr. Jones ; a decorated 16 year veteran of the US Army and a former DHS Security Officer for 7 years; has also qualified as a member of the Dean's List and had been employed with the work study program for several years and an intermittent student at DSC since 2011 ,to his knowledge had never been disciplined or reprimanded at the institution and had been peacefully visiting the veterans center for nearly 10 years without incident.

48. Although the threat and subsequent termination of Mr. Jones was the reason he reported the institution to the EEOC and Department of Education; it is relevant to the case that the plaintiff had made prior complaints that were contributing factors to the incident of that day.

49. The plaintiff had been working as a work-study program since 2017 . The program requires a student to apply for access to the benefit program every semester. The application process is facilitated by the work study site supervisor who is an employee of the school but credentialed by the VA to process the paperwork. To Mr. Jones' understanding , although the school hires the site supervisor; it is a position established under federal law. To the plaintiffs knowledge this accreditation process is contingent upon annual training that is required by the VA that includes a background check and knowledge assessment about the rights , responsibilities and duties of a work study site supervisor .

50. Mr. Jones was employed during the prior semester under the supervision of Mr. Alex Castillo. Mr. Castillo had replaced work- study supervisor Robert and his assistant Lisa . The expectation was that Robert's , position as Veterans Center Coordinator was to be assumed by benefits coordinator, Lisa. However, when Lisa did not get the job ; many of the work studys were highly upset. Although Mr. Jones holds Robert and Lisa in high regard ; he believes that , out of a genuine concern for veterans they allowed certain work studys to remain employed there in spite of their short comings.

51. Apparently many of the veterans who were employed there had not served in the military very long. Some were dishonorably discharged ; some had substance abuse and severe emotional issues allegedly due in part to their service. Mr. Jones noticed that these veterans with suspect service histories were frequently allowed access to the program while other veterans seeking employment were frequently passed over.

52. Mr. Jones also came to realize that the same problematic veterans were hired again every semester. The plaintiff soon became aware that this arrangement was a consequence of the actions of these work studys themselves. Mr. Jones observed this " group " of veterans essentially had a "hold" on the program and anyone not a part of the " group" were essentially " black-balled " by the " group" veterans. The site supervisors Robert and Lisa essentially allowed this " group " to run the program. Mr. Jones soon came to realize equal and fair employment opportunities was prefaced on acceptance into this " group " and their salacious activities.

53. The "leader" of the group Tania Williams; who apparently was romantically involved with a supervisor sometime during her enrollment; felt that this unprofessional and unauthorized relationship entitled her with the authority to decide who gets hired and fired and who was to receive work hours. Ms. Williams instigated much of the gossip and bullying ; often driving qualified applicants away.

54. She would frequently engage in accusing other applicants of drug use or other malicious slanders; even accusing Mr. Jones ; eventhough Mr. Jones witnessed **her** trade in and solicit other veterans for their prescription medications numerous times at the work site in violation of school policy[ " In compliance with the Drug Free Schools and Campuses Act of 1989, Daytona State prohibits the illegal use, purchase, sale, distribution, manufacture, or possession of drugs and alcohol on its campuses, or at any college-related activities. " This policy applies to all employees and students.] For the record Mr. Jones does not partake of illicit narcotics of any kind and is willing to take any drug test/ PV test to confirm this.

55. Mr. Jones , recognizing what type of person Ms. Williams was avoided and ignored her regularly and continued with his studies and Robert and Lisa generally were fair; however they allowed this individual to nurture this toxic and unprofessional work environment.

56. Another member of this group Benjamin Clemmons; who Mr. Jones witnessed having severe emotional outburst and regularly exhibit bizarre behavior also had a substance abuse problem. During one semester Mr. Jones had to call Mr. Clemmons roommate to take him home because he was so high off drugs he passed out on the couch.

57. Joshua Marcum who was hired after Mr. Jones ; became affiliated with the " group " and eventually started exhibiting the same behaviors even eventually becoming roommates with Mr. Clemmons ; Mr. Marcum, was often belligerent to other veterans and showed a pattern of violent behavior towards his supervisor. Alex Castillo . To Mr. Jones' knowledge , Mr. Marcum, he suffered from a substance abuse problem. He often showed up late to work and exhibited unprofessional behavior due to his condition. Mr. Marcum had been terminated numerous times, prior and after his untimely incident with Mr. Jones for similar conduct.

58. Eventhough many of these " group " members were people of color ; some of them exhibited racist tendencies; plaintiff witnesses Lawrence Thomas alleges he was nearly attacked by a fellow work-study who was an ex police officer, who was fired from his position for brutality against a prisoner. During this veterans center trip to Texas, this individual, while intoxicated hurled racial slurs at Mr. Thomas and almost physically assaulted him.

59. Sabrina Redding, who would later also engage with the dispute in question against Mr. Jones along with Mr. Marcum , the day the plaintiff got fired; also exhibited bizarre behavior and emotional outburst . When Lisa didn't get the Robert's position she was very upset; so upset in fact on the first day of Mr. Castillo arrived at work ( who was Robert's replacement ) ; she told Mr. Jones something to the effect that her and the " group " had a plan to ensure Mr. Castillo would not be given a chance to succeed stating to him " Don't worry we're gonna get rid of him." Mr. Jones was confounded by this statement , and he honestly didn't care , as he was mainly concerned about passing his classes.

60. During Mr. Castillo's term of employment Mr. Jones believes that he made the veterans center more equitable and personally got along with Mr. Castillo even giving him rides to work as Mr. Jones took public transportation and Mr. Castillo lived near him ; he hired new people and didn't engage in favoritism that had previously plagued the program . He allowed equal opportunity to all eligible students , even if he had personality conflicts with them. The " group " was highly upset about the end of their **favored vets** status , often rebelling exhibiting unfair recalcitrance towards Mr. Castillo. Eventually the complaints from the " group " work-studys got Mr. Castillo fired.

61. The plaintiff believes due to Mr. Jones's' acceptance of Mr. Castillo is what caused the " group " to " target " Mr. Jones for termination just as they had done for Mr. Castillo.

676

677    62.    To Mr. Jones' knowledge and belief the group planned to get Mr. Castillo fired in
678    an effort to retain their favored vets status , retaining their dominance in regards to work hours .
679    Mr. Clemmons , who often showed up late ; made numerous complaints against Mr. Castillo as did
680    Ms. Redding. Ms. Williams according to Mr. Jones's belief refused to work that semester or had
681    graduated, found the time to often come to the veterans center to harass working students.

682

683    63.    During one incident Ms. Williams came to the veterans center and said something
684    to the effect " yeah I don't like coming here anymore because we used to all be **friends.** ", when
685    Mr. Jones looked up Ms. Williams was glaring at him. Mr. Jones laughed to himself and returned to
686    his work , ignoring Ms. Williams as he always did as he didn't know what her issues were with him
687    and didn't care.

688

689    64.    To Mr. Jones's knowledge Mr. Marcum was terminated by Mr. Castillo due to a
690    dispute Mr. Marcum had with him , Mr. Castillo informed Mr. Jones that Mr. Marcum was
691    belligerent and disrespectful. Ms. Redding had either been fired or quit due to her recalcitrance in
692    regards to Mr. Castillo's leadership and Mr. Clemmons also had issues with Mr. Castillo. Mr.
693    Castillo was eventually fired due in part to the series of complaints issued against him by the "
694    group ". Mr. Jones witnessing these events unfold soon became concerned he would become a
695    target of their rage , since he " got along " with Mr. Castillo and contacted the VA and his Chapter
696    31 benefits counselor, Rene Wade, in November – December time frame , **months** before Ms.
697    Najera was hired. (Exhibit B)

698

699    65.    To reiterate Mr. Jones believes that these members of " the group " demonstrated
700    their resistance to Mr. Castillo having the job before he was even hired. They were so afraid to lose
701    their favored status ,they would have rebelled against anyone who wasn't their **friend.** Given that
702    this was a federal benefit program, it is without question that these workplace practices are
703    classified as a toxic work environment under EEOC regulations and is unlawful; yet was tolerated
704    and supported by Daytona State College for years.

705

706    66.    Mr. Jones had applied to for next semesters work study position prior to Mr.
707    Castillo's termination, Mr. Jones requested an **advance pay** which is a standard provision offered
708    to veterans seeking employment: there is even a checkbox organic to the form allowing the

_____

[PROPOSED] COMPLAINT IN INTERVENTION

709 veteran to request it ; a work study applies for a specific site and it is to be expected that they fulfill
710 that contract at that site. Under Mr. Castillo, the participants in the program each had a notebook;
711 students would keep their time cards and applications for employment in the notebook. Once
712 approved; a copy of the students contract and employment application; which included the
713 availability and contact information of the student also organic in the government issued work
714 study application form.

715

716 67. When he returned from winter break after Mr. Castillo's termination , Mr. Jones
717 saw Ms. Redding in the veterans center and she said to him " **oh you were on Alex's side weren't**
718 **you."**

719

720 68. Prior to Mr. Jones being hired by Daytona State College for the Spring 2019
721 semester , Mr. Kennedy ; took over the program from Michelle Goldys after Mr. Castillo was
722 terminated. To Mr. Jones' understanding, the veterans center was to be reorganized from scratch
723 and managed by Mr. Thompson.

724

725 69. Mr. Jones' employment contract was being reviewed by the VA when Mr. Castillo
726 got fired; it had already been approved by the VA prior to Ms. Najera being hired by DSC ; Mr.
727 Jones received notice of it sometime in the interim and was informed by DSC that Mr. Jones had
728 been hired as an **alternate** work-study . Mr. Jones was not aware what an "alternate work study "
729 was as the VA had no such classification but suspected it was something that would deprive him of
730 equal opportunity for employment; exactly what he had feared was going to happen and warned his
731 benefits counselor about a few weeks prior.

732

733

734 70. Mr. Kennedy held interviews , during the interviews Mr. Jones informed Mr.
735 Kennedy of his intentions regarding his education and informed him of his views on work. He
736 informed Mr. Kennedy that he was a team player ; yet did not tolerate threats or violence from other
737 coworkers, as he had an incident with his prior job where he was threatened by a coworker who
738 was a felon and was forced to verbally defend himself ; they were both terminated for the incident.

739

71. The plaintiff informed Mr. Kennedy that he did not intend to be terminated again and would not put himself in that position and that he would immediately report any threats to campus security.

72. Mr. Jones also informed Mr. Kennedy of some of the concerns he had with the " group" at the veterans center and that he did not wish for the behavior to continue and expected the center to be run in accordance with best practices for safe workplace environments established under EEOC laws. Mr. Jones also informed him that it was possible some of the other work studys may have held grudges against Mr. Jones for working with Mr. Castillo. Mr. Kennedy expressed his dislike for Mr. Castillo however, assured Mr. Jones that they did not tolerate threats at DSC and a zero tolerance policy was in place and Mr. Jones had nothing to worry about. This was the first time Mr. Kennedy lied to Mr. Jones.

73. DSC held an orientation in January 2019, to describe the new organization of the program, there would be "alternate" and " primary " positions; alternates were **only** to get hours if primaries essentially were to quit. The primary work study positions were now established as full time , which was highly irregular for VA work study positions.

74. Mr. Jones immediately recognized this as a violation of his contract and hours were to be provided at the work site he applied for yet he was denied equal opportunity for employment as he believed as a **retaliation** for " getting along " with Mr. Castillo.

75. Mr. Jones reported to Ms. Nejera, informing her that he was available for work and informed her his contact information was in his employee notebook if she needed him. He decided not to pursue the issue as he had to concentrate on his studies and did not have the time to pursue equity complaints.

76. During the middle of the semester, Mr. Jones had received his advance, and was concerned that he may accrue a debt as a consequence of DSC refusing to fulfill its contract. Mr. Jones contacted Mr. Nieves, who had been selected as a primary to ask his advice . Mr. Nieves warned him not to come back informing him things had gotten " bad " ; going into no further details.

77. Mr. Jones wanting to fulfill his obligations to the VA contacted Ms. Najera and informed her of his advance pay and the VAs requirement for the center to allow him the opportunity to work his contracted hours; especially the hours he had been paid in advance for.

78. Ms. Najera scheduled an appointment with Mr. Jones; however immediately lied to Mr. Jones telling him he [ Mr. Jones ] never left his contact information and work availability liked she asked ; Mr. Jones reminded Ms. Najera that his contact information and along with every other work studys' contact information along with their contract and availability hours was located in their employee notebooks.

79. Mr. Jones was authorized to work the last two weeks of the semester to complete his advance pay hours; on the first day Mr. Jones arriving by bus was a few minutes late. He called the veterans center and informed the center he would be there shortly; when he arrived he apologized to Ms. Najera and she said it was fine. The rest of the work day went without incident.

80. During the second day of work Mr. Jones noticed some bizarre behavior exhibited by Ms. Najera; during a discussion ; she informed everyone males and females included; that she couldn't get pregnant due to the fact she had ovarian cyst. She also admitted that she used to get abused by her ex husband. She did not mention the name similarities at this time. Mr. Jones was did not think it was an unprofessional thing to talk about , especially with someone she just met ; however, he ignored the comment as to not " rock the boat."

81. Mr. Jones often found Ms. Najera's behavior , highly irregular and strikingly unprofessional, he also observed Ms. Najera " petting " Mr. Nieves' hair numerous times . Mr. Jones noticed and was disturbed by this behavior but remained silent , Mr. Nieves looked as if he was in distress and didn't know what to do. Mr. Jones now understood why Mr. Nieves warned him not to come back to the veterans center.

82. Mr. Nieves informed Mr. Jones that one time Ms. Najera told Mr. Nieves to make him some mac n' cheese ; when Mr. Nieves asked Ms. Najera what water source he should use she replied " I don't care if you spit in it just get it done ! " ; Mr. Nieves was disgusted by this comment and found it highly unprofessional.

83. Later in the week Mr. Jones observed conversations surrounding Ms. Najera either receiving and or soliciting lunches from the employees; he also observed a conversation regarding a $ 50.00 bouquet bought by work study Mr. Patrick Toal as a gift for Ms. Najera, that she had accepted, a violation of ethics rules of state employees.

84. Mr. Jones observed a conversation between a work study and Ms. Najera wherein a work study was standing near Ms. Najera and heard the student say, "excuse me I don't wanna touch your " tiddies" Ms. Najera laughed. Witnessing this Mr. Jones froze in place , remained silent and quietly backed out of her office.

85. Mr. Jones never witnessed such behavior from a supervisor, male or female and was highly concerned; he realized he wanted to leave the center as soon as possible without incident and transfer to UCF in accordance with his plans , as her behavior and the behavior she promoted and allowed could not continue without incident. Mr. Jones wanted to be as far away from it as possible.

86. Mr. Jones' fears were confirmed when he heard from Mr. Nieves, a sexual harassment claim was made against a coworker by Ms. Najera after she apparently bought him a pair of underwear and this individual decided to try them on in the middle of the office. Mr. Jones does not know the details of this incident and allegedly occurred after Mr. Jones was terminated and was glad he was nowhere near the incident.

87. Ms. Najera approached Mr. Jones concerning a call she received where she informed him a DSC staff member got her name and Mr. Jones's first names confused , this is when Ms. Najera told Mr. Jones " I hate my name cause it sounds like a **black guys name**."

88. Mr. Jones also recounted an incident where during his finals Mr. Jones requested to go to the library ; Ms. Najera allowed him. This was common practice for the work study program if the center was not busy, during his test , Mr. Jones received a text from Mr. Nieves, telling him to get back to the vet center quick or he was going to get fired. Mr. Jones rushed to finish his test; which he failed and returned back to the center with haste. Where he talked Ms. Najera out of terminating him that day.

---

89. Mr. Jones later found out by Mr. Nieves, as he was present during the interaction and after Mr. Jones was allowed to leave to the library. Mr. Nieves testified that after he left ; Ms. Najera told him " see that's what I don't like --- I'm going to give him enough rope to **hang** himself." Mr. Jones found out that Ms. Najera falsely informed Mr. Thompson that he left the veterans center without asking ; which was mentioned as a contributing factor towards his termination.

90. Mr. Nieves also informed Mr. Jones , that he heard Ms. Najera stating she didn't want to hire Mr. Jones because his name triggered her , because it was similar to her ex husband's name. This was prior to Mr. Jones working there  Mr. Nieves has testified in court to this, signed an affidavit and is willing to take a lie detector test to confirm this.( Nieves Affidavit )

91. The name similarities were confirmed that were supplied to Mr. Jones by an anonymous source, when a text was sent to him with a photo of Ms. Najera's divorce certificate, showing her ex husband's name to be **Damian;** Mr. Jones's first name is **Damon**. For the record the name  Damon and Damian are  of **Greek** origin.

92. Mr. Jones being African American and the comment made by Ms. Najera  about the perceived **ethnicity** of Mr. Jones's name,  the desire to **hang** Mr. Jones metaphorical or otherwise  , the confirmation about the similarities Mr. Jones's name had with her ex- husband,  the unfair treatment Mr. Jones was receiving from Ms. Najera and the slanders Ms. Najera was proffering to her supervisors about his performance; paints a 'convincing mosaic' that Ms. Najera had intentions on not allowing Mr. Jones equal opportunity to work under the conditions of his contract and was looking for reasons to deny him of equal access to the benefits program **before he was employed there** due at least in part to his ethnicity as her statements have distinct racial undertones attached to them as it is common practice to deny individuals of employment based on the perceived ethnicity of their name.

93. Denial of services based on someone's ethnic or perceived ethnic characteristics is **strictly prohibited** under federal law, it is important to note Mr. Jones ignored these comments until he was certain his race was a contributing factor in his unlawful termination.

---

**42 U.S.C. §2000d, Prohibition against exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on ground of race, color, or national origin**

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.(Pub. L. 88–352, title VI, §601, July 2, 1964, 78 Stat. 252.)

94. Latter that week Mr. Jones got into an animated discussion with Mr. Marcum and Ms. Redding ; Ms. Najera was at a meeting and not present during the discussion in spite of the false claims made by her attorney in his reply brief to the plaintiffs original complaint to the Florida Commission on Human Relations ( Exhibit C).

95. Mr. Marcum and Ms. Redding both adopted adversarial positions to Mr. Jones ; Ms. Redding was especially erratic as she was jumping up and down. So erratic in fact Mr. Jones thought she was on some type of controlled substance during work hours but could not confirm this . Mr. Jones did notice the smell of alcohol on Mr. Mr.Marcums' breath and realized the drug problem at the veterans center had only gotten worse under Ms. Najera's supervision.

96. Mr. Jones was not really paying attention to either of them and laughing about their ridiculous opinions as he was preoccupied with his work. He did not take the discussion seriously. A customer was present during the animated discussion apparently reported them to Ms. Najera when she returned. Mr. Jones noticed the customer seemed intoxicated herself as she was making sexual comments towards work studys and proclaiming loudly " I got 100 % !" in reference to her recent VA disability benefit award.

97. Ms. Najera reprimanded the work studies and all of them eventually apologized; and were ordered back to their desk. On the way back to the desk Mr. Marcum, still smelling of alcohol; engaged in a dispute, with Mr. Jones where he admittedly told Mr. Jones ; twice to " Turn around; shut the f—k up or I'm going to do something to you. " Mr. Jones ,responded with " do what you have to do" , and quietly returned to work. When Mr. Jones told him this; Mr. Marcum

903
904
905

ran to tell the acting Veterans Center Supervisor , Ms. Damaris Najera, Ms. Najera subsequently
fired Mr. Jones after Mr. Marcum went to speak with her later that day.

906
907
908
909
910
911

98.     The plaintiff believes Ms. Najera and Mr. Thompson used Mr. Marcum to back
their unlawful labor practices because of his size and when Mr. Jones refused to be bullied and
intimidated by Mr. Marcum, who was not a supervisor , that Mr. Jones had to be removed. When
Mr. Jones returned from a bathroom break , he was informed by Mr. Marcum that Ms. Najera told
him to tell the plaintiff to " go home ."

912
913
914
915
916
917
918
919

99.     Mr. Jones ignored Mr. Marcum and told him he'll wait for a supervisor to tell him
personally. Mr. Jones's ' intent to speak to Ms. Najera was to decide whether or not he was going to
file a complaint against Ms. Najera, he was fully cognizant of maintaining his composure as he
did not want to spoil a potential complaint with a saying the wrong thing, in fact he had been
prepared for this moment for months in preparation for the inevitable administrative "attack" by the
"group" , that he had expected since Mr. Castillo was fired, by doing legal research in regards to
his rights.

920
921
922
923
924
925
926

100.    When Ms. Najera returned from a smoke break with Ms. Sabrina Redding; she
informed him that he was not to apply for next semester because Mr. Jones " didn't get along " with
other work studys , specifically Ms. Sabrina Redding and Mr. Marcum two members of " the group
" who had animus against Mr. Jones from the prior semester, for being" friends with Alex"[ Mr.
Castillo] . Ms. Nejeras statement reminded Mr. Jones of Ms. Redding's words said to him by her at
the beginning of the semester " Oh you were on Alex's side weren't you."

927
928
929
930
931
932
933

101.    Mr. Jones disagreed and informed her that he believed what she was doing was in
violation of equity laws and that he would be informing her supervisor, Mr. Thompson, that he
believed she was violating his civil rights and was engaging in unfair labor practices. Ms. Najera
told Mr. Jones " that's fine "and to fill out his time card. Mr. Jones informed her that he would fill it
out later after he spoke with Mr. Thompson, according to Mr. Jones , he placed the notebook the
time card was in , in the bookshelf and left quietly ( Exhibit D).

934
935

102.    During the Friday May 10th conversation Mr. Jones had with Mr. Thompson
regarding the treatment he had received from Ms. Najera; Mr. Thompson mentioned that[ he ]Mr.

_____

[PROPOSED] COMPLAINT IN INTERVENTION

Jones would " never win " ; because the institution had " 30 million dollars worth of lawyers, " , Mr. Jones said nothing about suing the school and only sought to file a complaint against Mr, Marcum for his threat.

103.    Mr. Thompsons statements being indeed a threat of legal retaliation, which was later carried out with Ms. Najera's retaliatory false stalking allegations, were designed to **coerce** Mr. Jones into not filing his complaint are an **enjoinable unfair labor practice** and was a foreboding precursor to the lengths the DSC employees , with the full support of DSC, to silence , discredit and interfere with Mr. Jones' duly administered complaint to oppose discrimination in the workplace; not only defined by federal statute law but by binding supreme court precedence.

104.    **Burlington N., 548 U.S. at 66-67** ["citing with approval the example of an employer's lawsuit against an employee held actionable under the NLRA's (National Labor Relations Act) anti-retaliation provision, as explained in Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 740 (1983))."

**Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 740 (1983))."**

"(b) However, it is an **enjoinable unfair labor practice** to prosecute a baseless lawsuit with the intent of retaliating against an employee for the exercise of rights protected by the Act. Such suits are not within the scope of First Amendment protection, and the state interests noted above do not enter into play when the suit has no reasonable basis. Pp. 461 U. S. 743-744."As per EEOC , DOE and FLSA regulations under the authority of title VI , once an individual informs the institution of a discrimination complaint they are engaged in a ' protected activity ', which protects them from retaliation by the institution; **retaliation includes intervening or interfering with the process through threats , legal or physical or intimation** and adverse material actions. Mr.Thompson a credentialed Equity Officer , began retaliation the moment Mr. Jones informed him about his complaint.

[**Section 15(a)(3) of the FLSA** states that it is a violation for any person to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."

**Employees are protected regardless of whether the complaint is made orally or in writing.** Complaints made to the Wage and Hour Division are protected, and most courts have ruled that **internal complaints to an employer are also protected.]**

105. Retaliation is prohibited under each of the civil rights laws that OCR enforces, including Title VI. Retaliatory acts against any individual who exercises his or her rights under Title VI are considered to be discrimination and are unlawful.

106. **Recipients of federal funds are prohibited from intimidating, threatening, coercing, or discriminating against any individual for the purpose of interfering with any right or privilege secured by the statutes that OCR enforces."**

107. Mr. Jones believes, once he informed Mr. Thompson of his intent to file a complaint on May 10th , Mr. Thompson leapt into action, with the intent to interfere as a retaliation for his " protected " complaint. Mr. Jones has evidence that; Mr. Thompson coordinated with Ms. Najera to immediately retaliate in an effort to discredit Mr. Jones and issued a series retaliations in the form of slanders, perjuries and falsehoods on official documentation to law enforcement and to the courts; that continue to this day.

108. On the following Monday May 13th Mr. Jones went to the security office on DSCs' main campus to report Mr. Marcum for his threat , as instructed by Mr. Thompson during the Friday May 10th conversation. Mr. Jones was asked by the security officer on duty the first name of Mr. Marcum; when Mr. Jones couldn't remember, the security office called the veterans center and informed him that he was being falsely accused of throwing a notebook in Ms. Najera's office and was being banned from the veterans center. Mr. Jones instantly recognized this as retaliation under titles VI and VII and an immediate response to his complaint. This was the first time the security guard heard of the banning.

109. It is important to note that Mr. Jones did not receive the materially adverse action i.e banning until it was confirmed that he intended to follow through with his complaint, thus establishing a. Sine qua non; "**but for** "causation pattern in regards to the " ever expanding prohibitive bans ", as described by Counsel Hall in his Florida Commission on Human Relations rebuttal letter to the plaintiffs discrimination complaint.

110. The singular act on 13 May 2019, of falsely claiming Mr. Jones threw a notebook **only** when he arrived at the security office to file his complaint, directly linked and initiated the persistent pattern of DSC retaliations in the form of prohibitive bans and slanders against Mr. Jones' for his engagement in ' **protected activity** ', which was, as previously stated; established verbally to Mr. Thompson on the 10th of May 2019.

111. When Mr. Jones sought to speak with Mr. Thompson, concerning the banning; Mr. Thompson became very agitated and started slamming his fist on the desk " I'm trying to protect my institution! " . Mr. Jones recognizing this as another attempt to intimidate Mr. Jones into not filing his complaint; quietly excused himself and immediately sought advisement from , Mr. Thompsons supervisor; Mr. Kennedy.

112. When Mr. Jones spoke with Mr. Kennedy he informed Mr. Jones , that he would fairly investigate his claims. However, this promise was proven false , when Mr. Hall describing in his rebuttal letter to Mr. Jones's' complaint to the Florida Commission on Human Relations ( FLCHR ) , that Mr. Kennedy was on Mr. Thompsons and Ms. Najera's' side " **the entire time** " , Mr. Halls admission, proves that Mr. Kennedy also was intent to corrupt Mr. Jones's complaint prior to hearing the facts and was willing to cooperate in whatever scheme his employees wanted to participate in.

113. Mr. Kennedy found in favor of his subordinates actions even though he could provide no evidence, citing " alternative facts " as his justification for believing them without proof. Mr. Jones responded by immediately requesting a judicial affairs committee hearing; Mr. Kennedy "warned "Mr. Jones there would probably be repercussions for pursuing the matter further and that he was the chairman of the committee, essentially threatening Mr. Jones with adverse material action to drop the case. Mr. Hall later falsely claimed in his FCHR response letter that it was Mr. Kennedy requested the hearing based on Mr. Jones's "behavior" .

114. Mr. Kennedys threat came true when Mr. Jones was summarily banned again after his participation in the judicial affairs meeting, the ban was expanded to the 2nd and 3rd floor of building 100 on main campus ; with no reason given for the expansion of the ban .

115. This retaliatory ban was the second , in " a series of expanding prohibitive bans" resulting **directly** from his participation in anti discrimination activities **not stalking** , which deprived Mr. Jones and of resources critical to his success in his education and denied him equal employment opportunities

---

and the ability to report further discrimination , because all of the reporting offices are located on the 2nd and 3rd floors.

116.    Given that Mr. Jones was already designated a **threat** by Ms. Najera, by virtue of his " **black guys name"**, which was similar enough to her abusive ex husbands to illicit prejudiced opinions about him ; so much so that she informed Mr. Nieves that she had no intentions of hiring him because of it. Then demonstrating her bias once he was hired by seeking to " **hang** " Mr. Jones , for leaving the veterans center to finish his finals after she gave him permission to do so, Ms. Najera then attempted to fire Mr. Jones the same day ; falsely telling her supervisor that he left without asking. Ms. Nejera obviously had something " personal " against Mr. Jones and sought to terminate him without cause , looking for reasons to fire him, even if it meant she had to fabricate them.

117.    It is clear Ms. Najera was actively seeking to deny Mr. Jones equal employment opportunities based in part the suspected ethnicity based on his name ; even prior to him being employed there and that Mr. Jones was justified in seeking relief under discrimination laws; after he was terminated a second time in the same week , fired after being threatened by a white coworker; a white coworker who had been terminated numerous times for making threats, yet was allowed to remain employed there for a full 3 months ; after Mr. Marcum admitted his threat, in violation of the schools zero tolerance policy.

118.    It is also clear that Mr. Kennedy and Mr. Thompson were intent on depriving Mr. Jones equal employment opportunities prior to the beginning of the semester as they had already established a means of exclusion in the form of the " alternate" ; " primary" classifications ; classifications that they personally created and not affiliated with the VAs understanding of the program whatsoever.

119.    Mr. Jones does not know if Mr. Kennedy and Mr. Thompson or Ms. Najera are necessarily racist .as they retaliated so much , a proper investigation could not be held . but believed they could deny Mr. Jones employment without evidence based on racist and bigoted tropes about African Americans and disabled veterans. which are discriminatory and racist acts.

120.    Throughout these incidents these individuals regularly demonstrated their willingness to promote these racist tropes with impunity and wield them as a weapon, deliberate slanders with a long history of racist connotations i.e violent outbursts; " obsession " with a lighter skinned woman , claims of requiring a " slower pace " by Ms. Najera in her police report eventhough Mr. Jones maintains a

fairly high GPA in highly rigorous engineering course work, was routinely tested with above average intelligence in school and the military and is pursuing his PhD in Quantum Physics.

121.    Mr. Jones's history did not matter to these individuals or the local judges involved in his case ,the facts did not matter, evidence did not matter , his intelligence, his dreams and aspirations, his responsibility to his family, his service to his country and what he did to earn his benefits, nothing mattered , **because nothing matters to a racist but race and their preconceived notions about race .**

122.    Mr. Jones found the **suspicious timing** of the bans curious; given that of all of the false accusations of " violence " and " belligerence " made by DSC against him over the relevant period of time to courts and police ; that Mr. Jones was never expelled or reprimanded after any of these alleged incidents ; **only** receiving bans following his submission of official paperwork or documents pertaining to his complaint, thus establishing a glaring **causal connection** of between Mr. Jones's " protected activity " and DSCs **direct** retaliation due **only** to that activity, not his " behavior " . Mr. Kennedy virtually admitted this during the October 8th final injunction hearing

123.    Trial Transcripts Pg. 48

. HALL: What was the prohibition put against.

- Mr. Jones that the college made?

      MR. KENNEDY: First, we restrict him from the

- first floor of the building which Ms. Najeera works

- in.

      MR. HALL: Um-hum.

- - MR. KENNEDY: **And then after he filed his other**

- **petition, we -- we knew his -- he was just being**

- **obsessive and -- and continuing. So we restricted him**

- **from the Daytona Beach campus..**

1098  It is clear from Mr. Kennedys own words in court , that DSC was banning Mr. Jones for not
1099  dropping his complaint, and not for any belligerent or unlawful acts. This is a clear violation of retaliation
1100  statutes.

1101  124.  There were months of false allegations of stalking made against Mr. Jones during court
1102  proceedings , Ms. Najera even claimed to buy a gun and a dog because of it. As previously mentioned
1103  Mr. Jones was accused of throwing a notebook in Ms. Najera's office ; following her around campus;
1104  etc.  DSC counsel hall even claimed that security had to be called on Mr. Jones when he visited the
1105  school presidents office, concerning his complaints against Ms. Najera, implying he had to be
1106  physically removed This never occurred, Mr. Jones left a message for the school president with his
1107  secretary and left on his own volition.

1108  125.  What is suspicious about these accusations, is that after months of this so called "
1109  obsessive behavior " Mr. Jones was not reported to security or the police , until

1110  a. ) he reported Mr. Marcum for his threat

1111  b .) Mr. Jones reported Ms. Najera to the courts for continuously sending him emails after he
1112  requested her to stop via her supervisors numerous times .

1113  126.  Given that the school initiated bans and court action only after Mr. Jones filed legitimate
1114  complaints; it is without question the institution was retaliation **for** those legitimate acts. It is the very
1115  definition of retaliation. The bans were issued as follows;

1116  1)  May 13th, from the veterans center, after Mr. Jones initiated a report against Mr.
1117  Marcum for his threat on May 10th.  To be clear , the security office was **not** informed of Mr. Jones'
1118  alleged notebook throwing incident **until** the moment he reported Mr. Marcum.

1120  a.) Mr. Jones believes Mr. Thompson had concocted a story with Ms. Najera over the weekend
1121  and planned to retaliate against Mr. Jones if he decided to report Mr. Marcum.

1123  b.) Mr. Jones also believes that this is the reason why; during Ms. Nejeras injunction trial, Mr.
1124  Thompson had such a difficult time recalling the date of the incident; because he knew his
1125  motivations would be questioned if he did not give an adequate response as to why the
1126  alleged notebook throwing was not immediately reported :

1128  Trial Transcripts Pg. 40-41

1129     MR. JONES:- When did I throw the notebook is when

1130

1131     14· ·I'm trying to pin down?· I'm sorry.

1132     15· · · · MR. THOMPSON:· Again, it was before – it was

1133     16· ·after we had our meeting.· It was after we had our

1134     17· ·meeting.· **So it had to be the next day because – or**

1135     **18· ·the day after.·** It was after we had our meeting.

1136     19· · · · MR. JONES:· **Mr. Thompson, how can it be the next**

1137     **20· ·day if the 10th was on -- May 10th was on a Friday and**

1138     21· ·--

1139     22· · · · MR. HALL:· Objection, Your Honor.

1140     23· · · · MR. THOMPSON:· Yeah, it's --

1141     24· · · · MR. HALL:- Asked and answered.·

1142     MR. JONES:· The relevance is that it would be

1143     **2· ·impossible for me to throw the notebook the next day**

1144     **3· ·if it was -- if the school was closed.**

1145       127.   In August 2019 , Mr. Jones was banned from the 2nd and 3rd floor , after Mr. Jones
1146 convened an institution Judicial Affairs Committee , to inquire about his initial banning from the
1147 veterans center , harassing emails being sent by Ms. Najera and the threat made by Mr. Marcum, as
1148 they had given Mr. Jones no updates concerning the issue for 3 months.
1149

1150       128.   Mr. Jones was " warned" by Mr. Kennedy prior to his request to convene the judicial
1151 affairs meeting, informing him that often the committee retaliated for students seeking relief , and that
1152 **he** was the chairman of the committee. The reasons for Mr. Jones's banning were not enumerated in the
1153 letter he received informing him of it.
1154

129. Mr. Kennedy later admitted in court that the [ second ] banning was a direct retaliation by the school as a response to my " protected activity " which included my injunction against Ms. Najera for what he felt were harassing emails. Mr. Kennedy was confused as he issued so many bannings that he lost track , the main campus banning was the **third** banning.

130. September 2019 banning as a response to Mr. Jones requesting an injunction against Ms. Najera after witnessing her and Mr. Thompson perjure and inform him she had purchased a weapon in response to Mr. Jones' original ' protected ' complaint of discriminatory behavior against Ms. Najera and her supervisors.

131. Mr. Jones believes Mr. Thompson, Mr. Kennedy and Ms. Najera , believed they could get away with simply accusing Mr. Jones of violence without proof based **only** on **stereotypical racial tropes** because of his racial class and to some extent they were proven correct considering the behavior of the local Judges. According to Mr. Jones ' witnesses ; Mr. Kennedy and Mr. Thompson both have histories of making racially discriminatory decisions against African Americans eventhough they are both themselves African- American.

132. Plaintiff witness; Mr. Lawrence Thomas who is African American : was disciplined by Mr. Kennedy when Mr. Thompson informed him of an incident when he was given a reprimand for not citing his book report in the proper format ; when Mr. Thompson informed Mr. Kennedy of the issue , Mr. Kennedy immediately sided with the teacher , without reviewing the evidence . Mr. Kennedy also believed Mr. Thompson cursed out an administrator, who happened to be white ; without requiring evidence ; Mr. Thompson was banned for 30 days. Mr. Thompson was forced to convene a school judicial affairs committee whereupon they discovered that Mr. Thompson was indeed in the correct format and Mr. Kennedys decision was reversed. ( Exhibit E )

133. Mr. Nieves also testified that during a discussion with Mr. Thompson, that he refused to hire an African American maintenance team , due to the condition of their tools; Mr. Thompsons demeanor was derogatory and shows his discriminatory practices against African Americans.

134. At this time it is important to establish DSCs views on discriminatory behavior between intra- racial class discrimination. According to Mr. Hall, DSC believes and has developed its equity program around the assumption that " it is axiomatically impossible for people of the same racial class to discriminate against each other " . It is also the position of DSC that " It is axiomatically impossible

1189     for people of the same sex to sexually harass each other ". However, the supreme court views this
1190     quite differently

1191
1192     135.    **In Castandea v. Partida, 430 U.S. 482 (1977),** the Supreme Court explained that "because
1193     of the many facets of human motivation, **it would be unwise to presume as a matter of law that**
1194     **human beings of one definable group will not discriminate against other members of their**
1195     **group."**

1196
1197     136.    Furthermore the EEOC does recognize discrimination between individuals of the same sex
1198     and race.

1199
1200     137.    Perhaps the most egregious and calculated example of retaliation through administrative
1201     sabotage. is when after the plaintiff sought assistance from the FLDOE . Mr. Thompson falsely
1202     informed the Florida Department of Education representative Tashi Williams. that Mr. Jones had hired
1203     a lawyer and intended to sue Daytona State College. Mr. Jones at the time hadn't made that statement
1204     claiming he was intending to sue , nor has he ever hired a lawyer up to the date of writing this
1205     correspondence.

1206
1207     138.    Mr. Thompson, being a so called equity expert had enough information about the equity
1208     process to know if he informed the FLDOE that Mr. Jones hired a lawyer, that the FLDOE would
1209     refuse to accept the complaint and relegate his case to the General Counsel's office, essentially actively
1210     and intentionally cutting off Mr. Jones from the external equity process, which would give him time to
1211     manipulate Mr. Jones' complaints. behind the scenes to his own unscrupulous ends.

1212
1213     139.    After Mr. Thompson spoke with the FLDOE Investigator Mr. Jones initially contacted,
1214     Mr. Tashi Williams. Mr. Williams became very uncooperative, telling Mr. Jones " we cant help you if
1215     you sue ", Mr. Williams then even hung up on Mr. Jones , when he questioned him about his position
1216     on the matter , This is considered retaliation through obstruction. It took 6 months of constant strife
1217     with the FLDOE to get any type of assistance from them. It is clear, the FLDOE and Mr. Thompsons
1218     intentions were to run down the time requirements for making discrimination complaints; hoping Mr.
1219     Jones would " let it go " This is retaliation through hindrance as per EEOC regulations and titles VI &
1220     VII.
1221

140. As previously stated Ms. Najera and Mr. Nieves had been communicating with each other for months, Mr. Nieves felt uncomfortable with the arrangement, yet he felt it was necessary to humor her retain his job.

141. Mr. Nieves was approached by Ms. Nejera to write a false statement concerning the notebook incident. Mr. Nieves felt Ms. Najera was basing his future employment was prefaced on writing the false claim as she mentioned his contract right before asking him to write it. He was also approached by Mr. Thompson about writing a false claim.

142. Mr. Nieves needed the job as he had a daughter to care for ; however he bravely refused to lie on Mr. Jones and informed Mr. Thompson and Ms. Nejera " I can write a statement but you won't like what it says ."

143. Mr. Nieves did not have to refuse to write the complaint. he was well liked by Ms. Najera, Mr. Thompson and Mr. Kennedy. So much so that Mr. Kennedy even had him working as his secretary ; eventhough it was an illegal arrangement as per work study regulations; work studys are only allowed to work on VA paperwork.

144. Mr. Nieves had also made the president's list getting all As during the prior semester and successfully completing a substance abuse plan. Mr. Nieves heroically placed his future in jeopardy because he had the integrity to tell the truth.

145. When Mr. Nieves refused to write the false statement, he called Ms. Najera because she stopped responding to his text and Mr. Nieves was scared he was about to lose his job, Although Mr. Nieves called Ms. Najera numerous times ,Ms. Najera never told him to stop.

146. Mr. Jones suspects Mr. Thompson told Ms. Najera to stop communicating with Mr. Nieves because he would not support the false claims and was now essentially "excommunicated " from the veterans program and all privilege because he refused to be a party to their illegal retaliation scheme.

147. This was confirmed two days later when Mr. Thompson falsely accused Mr. Nieves of " stalking " Ms. Najera, bringing consensual text between Mr. Nieves and Ms. Najera. Text that she provided as "proof " of Mr. Nieves " stalking" her , never telling him to stop communicating with her. Mr. Thompson also said to Mr. Nieves " That's what you get for jumping on Damon's [ the

plaintiffs ] bandwagon. " , which is clearly an admission of retaliation for Mr. Jones' participation in legal opposition to discrimination.

148.    Ms. Nejera and Mr. Nieves had been communicating after hours for months and he felt that this was simply retaliation against him for not backing the Defendants false claims against Mr. Jones.

149.    It is important to note that Ms. Najera later testified in court that she had **never** accused anyone of stalking in her life, this was with Mr. Nieves , whom she had accused of stalking a few months prior sitting no more than 5 feet behind her.

150.    Mr. Thompson later contacted Mr. Nieves inquiring about getting his assistance in getting Ms. Najera fired because he felt she had lied to him about the stalking accusations she had made against him. ( Nieves Affidavit)

151.    Mr. Jones was guilt stricken and felt responsible for Mr. Nieves termination and was horrified at the actions of Mr. Thompson and Ms. Najera, he felt this had transitioned into the realm of criminal behavior .

152.    The plaintiff had to eventually contact the FLDOE Inspector General, since Mr. Thompson obstructed through falsehoods the regular routes to file complaints through the organization , to get an investigation about what was had occurred , whereupon they determined that it sounded as if Mr. Jones was " definitely discriminated against ",( Exhibit F) and referred his case to the FLCHR ; as they did not have the jurisdiction to investigate those claims.

153.    During Mr. Jones pursuit of discrimination charges , Ms. Najera regularly sent " blast " emails to all veterans concerning veterans issues. After his unlawful termination Mr. Jones requested via her supervisors that Ms. Najera to cease all communications with him and to remove her from interacting with his paperwork, as she still had access and was tasked with administering his benefits.

154.    It was at this time Mr. Nieves began informing Mr. Jones about the conversations he and Ms. Najera had when they were on speaking terms : he began to inform Mr. Jones how disturbed he thought she was. He told Mr. Jones that she told him that she believed all of the work studys at her old school used to stalk her.

155.    Mr. Nieves also informed him that Ms. Nejera told him that she was already accusing Mr. Jones of stalking her in the parking lot. On May 13th, as previously mentioned Mr. Jones was involved in filing his complaints with various offices , he spoke with student advocate , Katherine Fulco concerning his complaint. He informed Mrs. Fulco that he really did not want to involve Ms. Najera in the complaint as this was stemming from an issue prior to her arrival.

156.    Ironically Ms. Fulco dismissed the plaintiff for the day instructing him to provide documentation that he said he was in possession of the next day, documentation Mr. Jones wanted to provide to prove these issues existed prior to her arrival. Again it was Ms. Fulco who told Mr. Jones it was time to leave , Ms. Fulco dismissed **him** for the day, Ms. Najera later claimed in court this was an incident where he was " waiting " for her in the parking lot.

157.    The school was closing and everyone was leaving out of the main front door of building 100 on main campus, Mr. Jones saw Ms. Najera coming down the stairs and Mr. Jones sped up to get away from her and continued his route toward the 60 bus located on international Blvd.

158.    Considering Ms. Najera's behavior concerning her falsehoods against Mr. Jones he became concerned about identity theft and her using any communications between them as an excuse to falsely claim he was stalking her and requested via her supervisors and Ms. Fulco in an email Ms. Najera not to cease and desist sending emails to Mr. Jones. (Exhibit G)

159.    DSC never complied in this request over a span of 3 -4 months as Ms. Najera continued sending him emails ; they persisted in retaliation in regards to the 2nd & 3rd floor banning and they did not provide protection in the form of a school injunction against Mr. Marcum for his threat.

160.    Mr. Jones was concerned that DSC would continue to retaliate against him on behalf of Ms. Najera , Mr. Thompson and Mr. Kennedy and felt it was necessary to take the issue out of the hands of the school as they were persistently trying to cover up his complaint.

161.    In August Mr. Jones sought injunctions against Ms. Najera and Mr. Marcum for cyberstalking and the threat respectively as the school did nothing about it and retaliated against Mr. Jones for filing complaints. Later it was discovered upon receipt of this injunction, Ms. Najera issued a retaliatory injunction against him, an injunction stemming from a **labor dispute.** It was also discovered that Ms. Najera contacted the police that day for the parking lot incident, an incident that allegedly

---

occurred 3 months prior. Mr. Jones later discovered Ms. Najera filed a police report against him which contained demonstrably false allegations in it . This police report was filed after she received Mr. Jones's injunction against her , some 3 months **after** the alleged incident. Clearly demonstrating that Ms. Najera did not see , whatever she thought of the incident as an **imminent threat** , but simply an opportunity to retaliate.

162.    It is supported by the facts that due to the " suspicious timing " of Ms. Najera's fallacious police report, claiming Mr. Jones had been banned from campus when he was not , which placed Mr. Jones in extreme danger as he is an African American being falsely accused of stalking a female employee and subsequent injunction request; made some 3 months after the alleged incident, it is clear there was no imminent danger Ms. Najera was afraid of.

163.    Given that Ms. Najera's only complaint of alleged following was 3 months prior and she wrote in her complaint that her intent was to get Mr. Jones's to stop filing complaints, it is clear Ms. Najera a school employee was intending to obstruct Mr. Jones's ability, through legal means , using public dollars, supported by DSC to suppress his complaint, the very activity Mr. Jones had to seek relief in the courts in the first place. Again it is unlawful to engage in this type of activity.

164.    Mr. Jones first suspected that Judge Warren may have been unduly influenced after Mr. Jones requested his first injunction. Judge Warren denied his request based on what she assumed to be an attempt to turn a workplace issue into a stalking issue, essentially deciding the case before hearing his arguments as evidenced by her written response on the injunction denial.

165.    Mr. Jones applied a second time , this time attaching an email that he sent to Mrs. Fulco requesting after months, for Ms. Najera to stop sending him emails about job openings; and emails from Ms. Najera after the cease and desist request. Judge Warren again denied the hearing.

166.    Mr. Jones made a 3rd request this time asking Judge Warren recuse herself; it was then Judge Warren approved the hearing . During the trial Mr. Jones approved Judge Warren to preside over the trial assuming she presided over a fair trial, which she refused to do.

167.    During the first trial , Judge Warren was very polite , yet she did not allow Mr. Jones to field witnesses, nor did she allow him to submit any evidence. However, she did allow Ms. Najera's witnesses to be heard; namely Lonnie Thompson. ,wherein he proceeded to falsely claim that Mr. Jones

---

[PROPOSED] COMPLAINT IN INTERVENTION

1359      was a " fraud " for requesting a pay advance and that he was " following " Ms. Najera. " Ms. Nejera
1360      informed the court that she intended to file and injunction against Mr. Jones.

1362      168.     DSC attorney Hall also claimed in his FCHR reply letter echoed this falsehood , by
1363      doubling down on Mr. Thompsons perjury by claiming " Mr. Jones falsely told the VA that he was a
1364      full time employee, when he was only hired as an alternate".

1366      169.     Mr. Thompson Ms. Najera and Mr. Kennedy testified that the plaintiff was " loitering
1367      "outside Ms. Najera's office and mentioned the parking lot incident as stalking. Mr. Kennedy failed to
1368      inform the court that the incidents wherein Mr. Jones was accused of loitering were incidents Mr.
1369      Kennedy himself scheduled appointments to see Mr. Jones regarding his complaint.

1371      170.     Mr. Jones, being fearful that Ms. Najera was going to falsely accuse him of stalking, for
1372      his persistence in seeking relief against discrimination. stayed away from building 100 entirely, except
1373      on the rare occasion he made scheduled email appointments with specific staff members of the school.
1374      The incident where Mr. Kennedy claimed Mr. Jones was loitering outside Ms. Najera's office was after
1375      a scheduled meeting Mr. Jones made with Mr. Kennedy

1377      171.     Mr. Kennedys office is located across the hall from Ms. Najera's, and the judicial affairs
1378      office is right next to Ms. Najera's. Mr. Jones was not banned from the area at the time as it was before
1379      the judicial affairs meeting. After Mr. Kennedy excused Mr. Jones , he instructed Mr. Jones to speak
1380      with Ms. Ifield , the judicial affairs representative concerning the complaint he filed against Mr.
1381      Marcum as the school had not come back with a response for 3 months.

1383      172.     Mr. Kennedy **knew** , Mr. Jones was waiting outside the Judicial Affairs office because he
1384      sent him there , not because he was waiting for Ms. Najera. Mr. Kennedy told Mr. Jones to wait there
1385      yet later claimed in court that it was an incident of stalking, Mr. Kennedy made this false claim under
1386      oath as a retaliation for Mr. Jones not dropping his complaint. Mr. Jones informed the court of this
1387      during the trial, therefore Judge Warren, Attorney Hall, Mr. Thompson and Ms. Najera were all aware
1388      that the office incident, was **not** stalking. Mr. Jones intentionally bought this fact up to see if they
1389      would continue to claim it was an incident of stalking. They did in the final trial

1390      Trial transcripts Pg. 45 -

1391      MR. JONES: **Were you aware that I had a meeting**

1392 **...·with Mr. Kennedy that day?**

1393 · · · · MR. THOMPSON:· I'm aware that you had a meeting

1394 · ·with Mr. Kennedy that day, and I'm aware that you

1395 · ·could have waited in his office.

1396 · · · · MR. JONES:· For what, exactly, sir?·

1397 · · · · MR. THOMPSON:· For him -- once your meeting was

1398 · ·over, you were waiting on Ms. Sharon Ifield

1399 · ·(phonetic).· You could have waited in Mr. Kennedy's

1400 21· ·office.

1401 · · · · MR. JONES:· Were you aware that he directed me to

1402 23· ·Ms. Sharon Ifield's office after the fact, sir?

1403 · · · · MR. THOMPSON:· Yes.

1404 · · · · MR. JONES:· **So he directed me out of the office.**

1405     173.    The trial was continued under Judge Warren a second time, Mr. Jones was debating
1406 whether to ask the judge to recuse again after she allowed Mr. Thompsons 15 minutes of slanderous
1407 ranting during the first trial , at the initiation of the second trial Mr. Hall presented the email Mr. Jones
1408 had already submitted. in his second injunction request, which was denied by Judge Warren, to "
1409 prove" Mr. Jones was stalking Ms. Najera proclaiming " He's doing it again your honor ! " meaning
1410 Mr. Jones was continuing harassing Ms. Nejera.

1412     174.    As previously stated , The email Mr. Hall presented was the same email Mr. Jones provided
1413 to the court during his own second injunction request. Mr. Halls proclamation was meant to imply the
1414 email was sent recently, the email was 3 months old. Furthermore; the email was not sent to Ms.
1415 Najera, it was sent to Ms. Fulco pleading with her to make Ms. Najera stop sending emails to Mr.
1416 Jones. There were no threats in the email and it was Mr. Jones requesting Ms. Najera to stop contacting
1417 her.

1418     175.    The email also had a warning at the bottom, informing it was FERPA protected ; which
1419 means it could not be disseminated without the permission of the student, with a few exceptions, which

Mr. Jones does not believe DSC met. The Department of Education is presently investigating the incident.

176. Once Judge Warren received the email , she gasped without even given enough time to read it ; Mr. Jones immediately suspected " play acting " on her part. Mr. Jones objected informing her that the email was one he already sent to the court, that it was 3 months old, that it contained no threats and that it was an email sent in confidence to a student advocate pleading that one of her institutions employees to cease with the persistent harassing emails and slanders .

177. Although Mr. Jones submitted the email to the court prior to this incident it is apparent neither the Judge or DSC officials saw it because of their behavior and because of the second injunction denial they never received the injunction with the attached email; the point being , if DSC did not break the law with its antics , they at least **thought** they were breaking the law which is a criminal attempt at violating FERPA laws; the FERPA violation is presently being investigated by the Department of Education.

178. Judge Warren told Mr. Jones the legally inadmissible email was the **only** reason he was receiving the temporary injunction , and allowed Mr. Thompson to claim again Mr. Jones was a " fraud " for using his benefits; when Mr. Thompson finished his testimony Judge Warren joked with Mr. Thompson about how " he wont forget that [ regarding his testimony].

179. Ms. Najera informed the court that she had to purchase a gun and a dog because she was afraid of Mr. Jones ; she also testified that she never in her life accused anyone of stalking. The fact is both of these claims made by Ms. Najera were false; as Mr. Nieves was accused by Ms. Najera of stalking and he was sitting 5 feet behind her in the courtroom; furthermore she made the same claim about buying a gun and a dog .

180. After witnessing Ms. Najera perjure and essentially threaten him with a gun for filing a simple complaint , Mr. Jones was fearful that Ms. Najera and her supervisors would persist in retaliating against him this time armed with a court injunction, so he decided to file another injunction against Ms. Najera to keep her away from him ; which is all he ever wanted in the first place.

181. At this time Mr. Jones had seen enough and requested Judge Warren to recuse; based on her behavior; Judge Warren refused and decided to rule anyway; she found for Ms. Nejera based on the

_____

[PROPOSED] COMPLAINT IN INTERVENTION

email and immediately recused herself after the fact, which means she intentionally ruled on a case she would later describe as " conflicts " ; an act which could possibly be a violation of Florida and Federal law.

### 28 U.S. Code § 455 - Disqualification of justice, judge, or magistrate judge

(a)Any justice, judge, or magistrate judge of the United States **shall** disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

### Florida Statutes

**38.10 Disqualification of judge for prejudice; application; affidavits; etc. " .**—Whenever a party to any action or proceeding makes and files an affidavit stating fear that he or she will not receive a fair trial in the court where the suit is pending on account of the prejudice of the judge of that court against the applicant or in favor of the adverse party, **the judge shall proceed no further…."**

182.    Judge Warren was specific that Mr. Jones be allowed to complete his course work on campus ; two days later , DSC retaliated again by banning Mr. Jones again this time from the entire campus forcing him to drop all of his on campus classes and placing a stalking charge on his permanent student record.

183.    During the final hearing,  DSC staff again attempted to claim that Mr. Jones standing outside her office to harass her, this was after Mr. Jones  reminded them in the second trial that he was directed to wait for the judicial affairs officer by Mr. Kennedy himself . The fact that they had time to confer and speak with each other concerning that fact, DSC staff **chose** , to again falsely claim Mr. Jones was standing outside Ms. Najera's office to harass he, under oath .

184.    Judge Henderson mentioned Judge Warren's recusal and the fact she didn't submit on the record the reasons for her recusal; Judge Henderson continued the trial in spite of this discrepancy and like his predecessor,  refused to allow Mr. Jones to submit evidence,  did not allow all of Mr. Jones's witnesses did not allow Mr. Jones to cross examine Ms. Najera and allowed the unsubstantiated slanders of Mr. Kennedy and Mr. Thompson to continue.

185.    Mr. Jones filed for an appeal and received similar treatment from the Appeals court. Mr. Jones offered to drop the case if Ms. Najera would provide her gun receipts or animal vaccination records. Ms. Najera claimed she had never considered purchasing a dog or gun prior to her interactions with Mr. Jones.

---

[PROPOSED] COMPLAINT IN INTERVENTION

186. However, Mr. Nieves informed Mr. Jones that Ms. Najera told him she was almost kicked out of her apartment because she repeatedly refused to clean up after her dog , again this was prior to Mr. Jones even working at the veterans center, Mr. Jones suspected if Ms. Najera's claim were true , the records could prove or disprove she was committing perjury in reference to he gun purchases. The appeals court allowed Ms. Najera to continue her perjury unchecked and did not require her to provide proof of her purchases.

187. Mr. Nieves also informed Mr. Jones that Mr. Thompson had contacted him after the second trial asking for his assistance in getting Ms. Najera terminated. Apparently, Mr. Thompson came across some text that Ms. Najera that she had sent to a coworker; which claimed " she had Lonnie [ Mr. Thompson] wrapped around her finger. " Mr. Thompson wanted to Mr. Nieves to write a complaint against her.

188. Mr. Thompson also informed Mr. Nieves that she told Mr. Thompson that she was so scared of Mr. Nieves that she had to purchase a dog and a gun because she was so afraid of him. The same claim she made about Mr. Jones some 3 months later ( Nieves Affidavit).

189. Given the fact Ms. Najera made so many false claims in pursuit of her injunction, it is without question Ms. Najera along with her supervisors were retaliating through perjury , against Mr. Jones for filing a complaint against her as she had done with Mr. Nieves and apparently many, many other students.

190. Although Judges Warren , Henderson and the 5th district all erroneously found for DSC , their rulings were void ab inhito since they all violated the plaintiffs due process protections and failed to take notice of the jurisdictional constraints in regards to laws stemming from labor disputes; specifically the aforementioned under U.S.C. 29 statute.

191. Since the local courts failed to take judicial notice of the federal statute in question, the courts deprived Mr. Jones of his rights under the color of law and caused irreparable harm to his reputation due to their jurisdictionally bereft courts. The courts were informed by Mr. Jones and were aware there was jurisdictional questions involved. They intentionally ignored these laws and assisted DSC in their retaliation campaign wittingly or unwittingly.

192.    **A court acting without jurisdiction is not a court** and **the Judge is no longer a Judge** in that instant, in fact they are indeed impersonating a judge, furthermore if they are aware that they don't have jurisdiction, they can be held civilly and criminally liable for their decision as all judicial immunity is lost , as they are technically **impersonating a judge.**

193.    It is well established law that a Judge or even an entire panel of judges acting out of their jurisdiction, that the decision is not legally binding and in this case, even **the US Supreme Court** is prohibited from issuing a temporary injunction stemming from a labor dispute for **more than 5 days.**

194.    The plaintiff does not have to request anyone for relief because the decision is **void ab inhito** on its face.

195.    Fortunately the EEOC investigation allowed Mr. Jones to finally have his case heard in a court of **competent jurisdiction,** jurisdiction being the issue Mr. Jones had been arguing in the Appeals case the entire time. Mr. Jones then decided to have the case held in federal court as to avoid anymore undue interventions from state agencies and courts attempting to protect Mr. Thompson, Mr. Kennedy and Ms. Najera from accountability due to their affiliations with state or local governments.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

196.    Throughout every step of the process the plaintiff has peacefully and legitimately sought to resolve this issue without litigation, the defendants have done nothing but stonewall, perjure manipulate and threaten in their refusal to adhere to basic civil rights laws duties and responsibilities as a public learning institution. They have used dilatory tactics to deny the plaintiff access to his student records ,made demonstrably false and slanderous claims to law enforcement and the courts and has attempted to obstruct the plaintiffs ability to legally pursue opposition to discrimination in the workplace, a retaliatory act which is a separate violation of federal law.

197.    The plaintiff initiated a complaint to his VA benefits coordinator Mrs. Rene Wade concerning the workplace toxicity at DSCs veterans center, months prior to Ms. Najera's arrival. The VA informed him that they could not intervene with school affairs.

198.    Plaintiff informed DSC equity supervisor Lonnie Thompson of his concerns after he was unlawfully terminated from the veterans center by Ms. Najera. Plaintiff was subsequently legally

1553 threatened by Mr. Thompson, slandered by Mr. Thompson in court based on perjury , called a fraud in
1554 regards to his rights to equal access to his benefits,

1555
1556 199. Plaintiff informed Lonnie Thompsons supervisor Keith Kennedy of the incident, Mr.
1557 Kennedy subsequently ignored Mr. Jones complaint and sided with Mr. Thompson and Ms. Najera
1558 without considering the facts as he prejudicially sided with them " the entire time " as evidenced by the
1559 FCHR admission. Mr. Kennedy later threatened the plaintiff with materially adverse actions and
1560 followed through with administrative bannings which resulted in harm to the plaintiffs reputation and
1561 educational goals.

1562
1563 200. Mr. Jones contacted the Florida Department of Education yet was not allowed to file a
1564 complaint based on the false claims by Mr. Thompson that Mr. Jones was planning to sue , which
1565 caused them to divert his complaint to the General Counsel office of the organization amounting to a
1566 willful effort by Mr. Thompson to obstruct Mr. Jones's lawful and " protected " attempt to oppose
1567 discrimination in the workplace and at an accredited institution a violation of the law " ".

1568
1569 201. Mr. Jones reported to the incident to his congressional representative yet was informed
1570 that they refused to intervene in school affairs .

1571
1572 202. Mr. Jones contacted the veterans administration yet was informed that the VA would not
1573 intervene in school affairs .

1574
1575 203. Mr. Jones contacted the police about the false claims being reported about him to the
1576 police , which is a violation of Florida statues; they informed him that they refused to act because "
1577 nobody was harmed " , by the criminal activity of DSC officials.

1578
1579 204. Mr. Jones contacted the Department of Education , yet his case was dropped based on the
1580 false claim by the investigator Sairalina Montesino, that he did not initially inform her of the fact that
1581 he made racial complaints during his initial interview; the DOE representative also falsely claimed Mr.
1582 Jones did not provide information that racial claims after she requested it. Mr. Jones has emails
1583 proving that he indeed did provide the requested information and recordings of the interview exist
1584 proving Mr. Jones did inform her of the racial claims.

1585

_____

[PROPOSED] COMPLAINT IN INTERVENTION

205. Mr. Jones believes that the investigator was looking for excuses to drop his complaint and has filed an appeal in regards to the complaint which was common practice under the Trump administration; it is currently still under appeal.

206. Mr. Jones contacted Volusia county court system to enforce an injunction in an effort to stop harassing emails against him and to request protection for the threat made against him. The court subsequently falsely claimed Mr. Jones was " turning a workplace issue into a stalking issue ".

207. The court subsequently assisted DSC in their retaliation efforts , by allowing slanders to be made against the plaintiff in open court without substantiation, allowed inadmissible " evidence " against him , issued unlawful jurisdictionally bereft decisions and consistently violated his due process protections.

208. The Appellate court also assisted in the retaliation by backing the jurisdictionally bereft decisions of the lower courts , accepting the " obsession " claim in spite of binding precedence that making complaints are lawful activity even if they seem " obsessive " Aggravated stalking - numerous complaints

**District Court of Appeal of Florida,Fourth District.....Paul CURRY, Appellant, v. STATE of Florida, Appellee.** " A defendant's behavior of filing numerous complaints and reports about a former neighbor with government enforcement agencies did not constitute aggravated stalking as a matter of law, the 4th DCA held.Paul Curry appealed his conviction of stalking his former friend and neighbor. Jacqueline DiCarlo. DiCarlo obtained a temporary injunction against Curry, after which Curry filed about 40 complaints against her with various law and code enforcement agencies. Curry also made more than 40 public records requests concerning the woman. DiCarlo testified that Curry never verbally threatened or had contact with her after the injunction. The DCA reversed the conviction.

"Curry's conduct in this case was clearly knowing, willful, and repeated — and it may even be thought by some as weird and obsessive, with more than a tinge of spite to it — but it did not qualify as a violation of the anti-stalking statute. Viewed objectively, Curry's conduct had a 'legitimate purpose' under section 784.048(1)(a)," the DCA said.".

209. Mr. Jones' allegedly "obsessive ", yet **lawful** complaints were a consequence and necessity as a response he received from those charged with protecting his rights school officials , the

---

court , institutions and law enforcement failed in their duty to stop the institution from illegally retaliating ; therefore Mr. Jones was left with no choice but to continue his complaints in pursuit of his rights, Mr. Jones believes that local officials, including local judges , believe Mr. Jones does not have rights because he is African American and is actively taking actions in regards to this to ensure this is the case, this is what has compelled the plaintiff to seek assistance from the FBI for deprivation of his rights under color of law.

210. The plaintiff has never broken the law in this entire affair, yet his rights were violated , he maintains the institution is attempting to "accuse the accuser" and " teach "Mr. Jones a lesson about " knowing his place " , the only thing Mr. Jones has learned is how inept , vindictive and prejudiced Volusia county officials can be and never intends to stop holding them to account and will not cease until the facts and evidence of the case are properly reviewed in accordance with well established impartial evidentiary review.

211. Mr. Jones is not engaging in recalcitrance and has respect for the law and the positions people hold, however as a consequence of said position a certain amount of accountability is involved, Mr. Jones believes and has evidence that the aforementioned individuals have intentionally shirked their duty because Mr. Jones is acting as a pro se attorney and he is African American.

## FIRST CLAIM FOR RELIEF

## [Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a)]

212. Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

213. Although the Plaintiff believes that he was racially discriminated against and was the catalyst for his initial complaint, he holds that the retaliation efforts by DSC were far more damaging to his finances, reputation and education than the original infraction

214. The Defendants continuous and egregious violations of federal retaliation prohibitions, which include fraud, perjury , slander and possibly swatting , caused Mr. Jones to essentially receive a harmful injunction for pursuing his federally protected civil rights an injunction that cost him years in educational benefits . not to mention the damage it has done to his ability to support his child and the incalculable emotional harm done to him and other victims of their wholly illicit subterfuge in regards to their response to his legitimate federally protected right to make a complaint.

215. The Defendants also hired an attorney to assist in their character assassination attempt, who himself perjured to an appeals court , claiming knowledge to be his own facts that he knew to be false , in an attempt to intentionally mislead an appeals court about the existence of court recordings relevant to the case.

## **SECOND CLAIM FOR RELIEF**

### [Hostile Work Environment Based on Race in Violation of 42 U.S.C. § 1981]

216. DSC hired and retained employees who held racially discriminatory views and supported the racially motivated actions. DSC retained Ms. Najera after Mr. Jones informed them that she had made statements regarding " hanging " Mr. Jones and discriminatory comments regarding the ethnicity of his name.

217. DSC employees Thompson and Kennedy engaged in promoting racial tropes about Mr. Jones's alleged " obsession " with Ms. Najera as to distract from the unlawful acts of DSC. These individuals promoted this falsehood eventhough they were fully aware of the fact that Mr. Jones made numerous complaints against DSC employees other than Ms. Najera and that he sought to avoid including her in the complaint until she participated in retaliatory actions by falsely claiming he threw a notebook in her office.

_____

218. DSC also supported this false claim of notebook throwing without any proof or evidence , which resulted in his unlawful denial of Veterans Center access , but ultimately led to his banning from campus.

219. The Defendants also terminated Mr. Jones based on the false notebook throwing allegation sans evidence, while allowing a white employee Joshua Marcum, the individual who made the threat, an individual who had a history of making threats and being terminated for them , to remain employed there until he got into a belligerent encounter with a customer some 3 months later , whereupon DSC was finally forced to terminate him, although they still allowed him access to the veterans center.

## THIRD CLAIM FOR RELIEF

## [Race Discrimination (Disparate Treatment) in Violation of 42 U.S.C. § 1981]

220. 42 U.S.C. § 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

221. As stated in the previous section, it is clear that Mr. Marcum , a white student , was given much more latitude by DSC officials than the plaintiff in regards to this incident. He was authorized to make threats and intimidate customers and students, possibly while being intoxicated , in spite of DSCs zero tolerance and substance abuse protocols harrassment policy.

222. Furthermore, Mr. Hall stated himself that Mr. Jones was on the brink of being fired before his alleged " outburst" for his alleged " excessive tardiness " , which amounted to at the most , two lateness's, neither of them being more than a few minutes. Mr. Jones being an employee for years regularly witnessed work study employees not show up for days, not call in , come in late and still maintain his position.

223. Mr. Jones believes that Mr. Hall wrote this in his FCHR response letter as an excuse to justify Mr. Jones's' unlawful termination as there were no actual causes for it , a false one at that, that cannot be proven as there were no letters of reprimand issued to Mr. Jones for tardiness

224. . The fact remains When DSC was given the choice between an African American Deans List student , who paid $100 in Lyft fees , over a two week period to get to work on time , who had never been reprimanded by the school for his behavior and a white student who had been previously fired for making threats , was excessively late , initiated a threat against the plaintiff possibly drunk and who was fired after the incident with the plaintiff for more belligerent behavior DSC chose the white student. No greater contrast can be made in regards to this incident that demonstrates DSCs bias against Mr. Jones based on his skin color.

## FOURTH CLAIM FOR RELIEF

### [Vicarious Discrimination/ Negligent Supervision]

225. DSC allowed its employees to engage in malicious retaliation through perjury , filings of false police and court reports. DSC allowed Mr. Thompson to ban the plaintiff from school property based on fraudulent claims made by Ms. Nejera.

226. DSC allowed Mr. Thompson to illegally intervene in Mr. Jones's constitutionally protected right to lawfully oppose discrimination by falsely informing the Florida Department of Education that Mr. Jones was intending to sue, when he was not. This action caused the Florida Department of Education to forward his complaint to the General Counsels office of the organization, actively obstructing Mr. Jones' ability to file his complaint.

227. DSC allowed its employee Vice President Keith Kennedy , to assist his subordinates, Ms. Najera and Mr. Thompson in their fraudulent actions by denying Mr. Jones a fair and impartial review of the incidents surrounding Mr. Jones's unlawful and discriminatory banning from the Veterans Center. This was confirmed by DSC Counsel Halls admission on the FLCHR rebuttal document when he admitted that Mr. Kennedy had no intention of initiating an impartial investigation when approached by Mr. Jones about the incident, when he wrote " Mr. Kennedy stood behind [ his employees] the entire time ."

228. DSC allowed the employment of an unscrupulous attorney, Counsel Hall , in pursuit of their fraudulent persecution of the plaintiff, an attorney who regularly peddled in

---

[PROPOSED] COMPLAINT IN INTERVENTION

unsubstantiated sham stalking pleadings to the court; suborned his client to perjure in court

numerous times & perjured to the court himself when he falsely claimed that :

a.) Mr. Jones fraudulently informed the VA that he was hired by the VA full time to receive an advance in pay, when in reality, the VA does not require the student to inform them of full time / part time status as the work study position does not operate under those classifications. the VA provides the hours that a student works through contract .

b.) Mr. Hall falsely claiming, in the appeals court brief , that it was his own knowledge and information that recordings of the final injunction hearing did not exist or could not be made, a claim proven false when Mr. Jones found the recordings after a 5 minute search and had them amended to the record.

c.) Security had to be called on the plaintiff while he was making a complaint to the school presidents office.

d.) Mr. Jones was "only" hired to help move the furniture in the veterans center , when the veterans center had already been moved weeks before Mr. Jones was even allowed to fulfill his contract.

e.) Claiming knowledge of Mr. Jones's bus schedule and regular means of public transportation in an effort to create a false narrative of stalking, in regards to Ms. Najera's fraudulent claims of Mr. Jones following her in the school parking lot. Mr. Hall falsely claimed, in his FCHR rebuttal letter, that Mr. Jones never took the 60 bus adjacent to the parking lot, when in fact Mr. Jones regularly took the 60 bus.

f.) DSC allowed its employees to engage in illicit controlled substance abuse on campus in spite of it's own prohibitions; exposing students and employees to the wild and violent mood swings of its intoxicated employees.

g.) DSC supported the position, as evidenced in the FCHR rebuttal letter, that it believes racially discriminatory acts cannot exist between members of the same racial class: in opposition to the EEOC and US Supreme Courts determination, thereby allowing and in this case promoting racially discriminatory acts to be perpetrated against Mr. Jones by Mr. Thompson and Mr. Kennedy.

## FIFTH CLAIM FOR RELIEF

## Deprivation of Rights under Color of Law

## Section 242 of Title 18

229.    Given that DSC employees are employed by the state , they are public officials; title 18 prohibits a public official from using their authority to deprive an individual of their rights .

230.    DSC officials used this authority as a state institution to retaliate against Mr. Jones for his participation in lawful opposition to discrimination. They used fraud and perjury to deny Mr. Jones access to federally funded property in opposition of USC 42.

231.    DSCs unlawful retaliation also resulted in Mr. Jones receiving the erroneous injunction on his record.

232.    The 5th Circuit and 7th District Judges also being public officials participated in DSCs retaliation by violating due process, failing to take judicial notice of federal law and binding precedence regarding labor disputes.

233.    The local courts decision also denied Mr. Jones of his right to possess a firearm based on the erroneous injunction, violating his second amendment rights, although Mr. Jones does not own a firearm Judge Henderson's final erroneous decision denied Mr. Jones of this right eventhough it is a restriction only for "criminal" stalking.

234.    The plaintiff believes that this unlawful prohibition was instituted as a "political favor" to retaliate against Mr. Jones on behalf of influential DSC officials, DSC officials were well aware of the harm a weapons prohibition would do to Mr. . Jones's career if he decided to return to government service in his former capacity as a soldier.

235.    No weapons threat was ever made by anyone in this trial, except for the implied threat of Ms. Najera

## SIXTH CLAIM FOR RELIEF
## Violations of the Americans Disability Act
## ADA (42 U.S.C. § 12101)

236. During the aforementioned proceedings, DSC officials revealed their true attitudes towards disabled veterans like Mr. Jones. Mr. Jones suffered a permanent back injury due to his 16 years of service as US infantry soldier.

237. Mr. Thompson was actually Mr. Jones's indirect supervisor, in the capacity of a staff level Officer in the 53rd Brigade of while he was a member of the Florida national guard. Mr. Jones was a soldier in the B co. of the unit, he had to leave the national guard because he was injured **on duty** during a physical training test.

238. Mr. Jones was denied medical services by his unit, due to his injury and was eventually denied reenlistment prefaced on his injury and false accusations by unit leadership that Mr. Jones intentionally avoided seeking medical attention. The facts were Mr. Jones was denied access to medical attention by the VA and the Unit after years of Mr. Jones requesting medical assistance Mr. Jones received an honorable discharge in 2014.

239. Mr. Jones opened a Congressional investigation against 53rd Brigade and their response was to falsely claim Mr. Jones never sought medical attention for his injury and that he was injured off duty. Mr. Jones has in his possession documentation proving these claims false.

240. When Mr. Jones encountered Mr. Thompson he did not know he was his former supervisor, however Mr. Thompson recognized him.

241. When the issue of the threat arose Mr. Jones observed the same behavior that was exhibited by the unit

242. Mr. Hall reported in his FCHR rebuttal letter that Mr. Jones's injury was " perceived". All parties involved including Ms. Najera and Mr. Thompson both being experienced veterans who themselves utilized the GI BILL and were experienced GI BILL benefits administrator, were well aware of the fact that Mr. Jones could not participate in the chapter 31 Vocational Rehabilitation GI BILL program unless he was a disabled veteran.

243. Mr. Hall claimed in the FCHR letter that the plaintiff suffered his injury off duty. Although this was not true, this was the same story originally offered to Congress by 53rd Brigade. The only person who would have access to that claim would be Mr. Thompson.

244. The plaintiff believes that Mr. Thompson used his authority to look into Mr. Jones' confidential military files, violating HIPPA to win his case.

245. Mr. Hall also implied in court that Mr. Jones has PTSD and attempted to use this claim to discredit his discrimination claims as a disgruntled paranoid veteran and justification for DSCs unlawful retaliations against him. For the record Mr. Jones has never been diagnosed with PTSD, yet these act demonstrate they attempted to deny Mr. Jones benefits based on his perceived disability.

246. Ms. Najera's claim of " following" her in the parking lot and near the school's elevator failed to take into account Mr. Jones' necessity to utilize these resources as a consequence of his disability. Mr. Jones has degenerative disk disease and **must** use the most convenient accessible means to get where he needs to go.

247. That day, since he was dismissed from Ms. Fulco' s office by Ms. Fulco, as a consequence of his discrimination complaint and the closest route was the 60 bus on international boulevard, which the parking lot was the quickest route to get to the bus, it is without question that Ms. Najera's retaliatory and fraudulent claims of " following" by the plaintiff in the parking lot, failed to give due deference to Mr. Jones's disability.

248. Furthermore, her fraudulent claim ultimately deprived Mr. Jones access to public resources such as the elevator and parking lot, out of the fear that she would spontaneously accuse him of stalking, if she happened to see him in public areas.

249. To be clear the plaintiff was not banned from any of the areas at the time Ms. Najera claimed stalking, by the school or the court, these allegations were made as a retaliation and denied Mr. Jones services based partly on his disability or perceived disability. This as

well with all retaliations done by DSC officials was done intentionally, maliciously, with forethought, coordination and planning.

## DECLARATORY RELIEF ALLEGATIONS

250. A present and actual controversy exists between Plaintiff and Defendants concerning their rights and respective duties. Plaintiff contends that Defendants violated his rights under Titles VI, VII, 42 U.S.C. § 1981, the ADA , the Florida labor code and common law. Plaintiff is informed and believes and thereon alleges that the Defendants deny these allegations. Declaratory relief is therefore necessary and appropriate. Plaintiff seeks a judicial declaration of the respective rights and duties of the parties.

251. A present and actual controversy exists between Plaintiff and the 5th District court of appeals & the 7th Circuit courts of Florida concerning their rights and respective duties in regards to their issuance of injunctions stemming from a **labor dispute** in violation of jurisdictional federal statutes & due process violations in regards to his right to lawfully and peacefully oppose discrimination in the workplace, specifically in regard to the 7th Districts unconstitutional decision that a filed legal and discrimination complaint , a " protected activity" can be classified as harrassment and that they did violate jurisdictional constraints with their decision.

## INJUNCTIVE RELIEF ALLEGATIONS

252. No plain, adequate, or complete remedy at law is available to Plaintiff to redress the wrongs alleged herein ,as all opposing parties involved refuse to follow well established duties rules and laws in regards to their duties and responsibilities.

213. If this Court does not grant the injunctive relief sought herein, Plaintiff will be irreparably harmed.

1917

## PRAYER FOR RELIEF

1918 WHEREFORE, Plaintiff prays for relief as follows:

1919     1.    For a declaration that Defendants' and the 5th District and 7th Circuit courts
1920 of Florida actions, policies, and practices as alleged herein are unlawful;

1921     2.    For reinstatement;

1922     3.    For the establishment within the school of a fully staffed office for Equity
1923 Complaints who operates independently of school officials.

1924     4.    For the named individuals to be referred to the proper authorities by this
1925 court for intentional , persistent, criminal and malicious retaliation against students under
1926 their charge.

1927     5.    For the establishment of a board , which run by veteran students that is
1928 independent of the school hiring process, that approves or denies the individual who will
1929 be hired as Veterans Center Coordinator and Benefits Coordinator who holds the
1930 authority to recall the coordinator based on a vote. The plaintiff also prays to write the
1931 rules to this Counsel with the assistance of other veterans.

1932     6.    The establishment of a system within the school wherein all veterans who
1933 qualify and are approved by the VA for the work study program are given equal
1934 opportunity to work their contracted hours, regardless of the discretion of school
1935 employees.

1936     7.    For lost wages, penalties and all other compensation denied or lost to
1937 Plaintiff by reason of Defendants' unlawful actions, in an amount to be proven at trial;

1938     8.    For compensatory damages for Plaintiff emotional pain and suffering, in the
1939 amount of 7.6 million dollars , which may be reduced or increased based on the behavior
1940 ,honesty and cooperation of DSC officials during the proceedings of this trial ;

1941

1942     9.    For punitive damages , to be determined at the trial

1943     10.    For liquidated damages;

11.     For an educational scholarship to be established and funded every year by the state  for veterans of "combat arms" units only  , where recipients may grant their benefits to anyone they choose to sponsor.

12.     For interest on lost wages, compensation, and damages, including pre- and post judgment interest and an upward adjustment for inflation.

13.     For such other and further relief as this Court deems just and proper.

7

8

Dated: April 27ᵗʰ , 2021

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Damon Philp Jones , Pro Se

By:

DAMON P JONES
PRO SE ATTORNEY

[PROPOSED] COMPLAINT IN INTERVENTION

Filed 27 April, 2021  Page 64 of 61